UNITED STATES of America,
Appellee,

v.

George NATHAN et al., Appellants.

Nos. 493, 495, 503, 504, Dockets 72–1895, 72–1905, 72–1999, 72–2038.

United States Court of Appeals,
Second Circuit.

Argued Jan. 26, 1973.

Decided March 16, 1973.

Ronald E. DePetris, Asst. U. S. Atty. (Robert A. Morse, U. S. Atty., E. D. N. Y., L. Kevin Sheridan, Asst. U. S. Atty., on the brief), for appellee.

Jesse Berman, New York City (Lawrence Stern, New York City, on the brief), for appellant Nathan.

Joseph Stone, New York City, for appellants Brown, Boulier and Nash.

Before MOORE, HAYS and FEINBERG, Circuit Judges.

FEINBERG, Circuit Judge:

In August 1970, a one-count indictment was filed in the United States District Court for the Eastern District of New York, charging 21 defendants with conspiracy to violate the narcotics laws. 21 U.S.C. §§ 173, 174 (now 21 U.S.C. §§ 952, 960). The indictment also identified five co-conspirators who were not listed as defendants.[1] Eleven of those charged in the indictment were tried in 1971. Ten were found guilty, and this court affirmed their convictions. United States v. Vega, 458 F.2d 1234 (2d Cir. 1972). In June 1972, the four defendants involved in this appeal—George Nathan, Robert Brown, Clarence Nash, and Rene Boulier—were brought to trial on the same indictment before Chief Judge Jacob Mishler and a jury.[2]

---

1. Two of these co-conspirators testified for the prosecution in this case. The other three have been convicted in the United States District Court for the Southern District of Florida of violating 21 U.S.C. § 174.

2. Of the remaining six defendants, five are fugitives and one has pleaded guilty to a separate charge.

The Government's case rested principally on the testimony of two co-conspirators. The jury could properly have found that the four appellants had worked for or dealt with a group headed by one Jesus Torrado, one of the 21 indicted and now a fugitive, who was based in New York City. Heroin and cocaine were imported into the country through Miami, and purchased there by Torrado's men. They then brought the drugs to New York City and made sales to buyers in the city and elsewhere. Three of the four appellants were identified by Government witnesses as having purchased substantial quantities of narcotics from Torrado, apparently on a fairly regular basis. The fourth appellant—Rene Boulier—was described as a member of Torrado's organization, performing such tasks as preparation and delivery of heroin and cocaine. All four appellants were convicted, and they now appeal on divers grounds.[3]

### I. Double Jeopardy and a Prosecutorial Promise

The most substantial argument raised on appeal is based upon legal proceedings that took place in the United States District Court for the Southern District of Florida. Appellant Boulier was indicted there with 12 others on October 14, 1969 for his role in a drug importation and distribution conspiracy. Seven or eight of the 36 participants named in the Florida indictment were also identified as co-conspirators in the instant indictment in New York, which was filed ten months later. On December 20, 1971, a superseding information was filed in the Florida court, charging that Boulier, together with three named individuals (two of whom had also been named in the New York indictment), and others unknown, had conspired to violate 26 U.S.C. § 4704(a) by purchasing and selling heroin not in or from the original stamped package. Boulier pleaded guilty to the information, and the original Florida indictment was dismissed.

Boulier asserts that his guilty plea to the federal information in Florida precluded his conviction under the New York indictment by operation of the Double Jeopardy Clause. Judge Mishler rejected this claim, concluding that the conspiracy alleged in the information was separate from and not merely one component of the conspiracy described in the New York indictment.

We need not decide whether the two conspiracies charged were identical in fact.[4] It is sufficient to observe that the two convictions were based upon different statutory violations; the

---

3. Appellant George Nathan was sentenced to 15 years in prison and a $20,000 fine. The other three appellants each received a prison term of ten years and a fine of $10,000.

4. Based upon the facts presented to us, this would appear to be a close question. See United States v. Wilshire Oil Co., 427 F.2d 969, 976 n. 12 (10th Cir.), cert. denied, 400 U.S. 829, 91 S.Ct. 58, 27 L.Ed.2d 59 (1970) (defendant must establish such identity by a preponderance of the evidence). It is true that the two conspiracies overlap in time (the Florida information alleged a conspiracy lasting from April 15, 1968 to October 23, 1969; the New York indictment charged a conspiracy that continued from January through August 1968), that two of Boulier's three co-conspirators named in the Florida information also were identified as participants in the con-

spiracy at issue here, and that the criminal activity in both conspiracies involved distribution of narcotics. But these common elements in themselves do not necessarily establish a double jeopardy violation. See United States v. Barzie, 433 F.2d 984 (2d Cir. 1970) (per curiam), cert. denied, 401 U.S. 975, 91 S.Ct. 1194, 28 L.Ed.2d 324 (1971). More serious, however, is the Government's admission that one of the two overt acts alleged in the information—apparently the more serious one—"may well be the same as" one of the acts listed in the New York indictment. Moreover, and perhaps most significantly, the testimony of the government agent offered at the Florida hearing to test the basis for Boulier's guilty plea described the conspiracy there charged in terms that at least suggest that it may be the same as the conspiracy here in question.

second, unlike the first, required a showing of defendant's knowledge of illegal importation.[5] That a defendant may be punished for multiple violations of the narcotics laws arising from a single transaction is well settled, see Gore v. United States, 357 U.S. 386, 78 S.Ct. 1280, 2 L.Ed.2d 1405 (1957);[6] and we are not aware of any constitutional requirement that all such violations must be tried together. See, e. g., United States v. Jones, 334 F.2d 809, 811 (7th Cir. 1964), cert. denied, 379 U.S. 993, 85 S.Ct. 707, 13 L.Ed.2d 613 (1965).[7]

■ Boulier advances another argument based upon the Florida proceedings. The supersession of the original indictment by the information and Boulier's guilty plea were the outgrowth of an agreement between the federal prosecutor in the Southern District of Florida and Boulier's attorney. Under this agreement, Boulier was to provide federal authorities with information concerning the sale and distribution of narcotics in the United States and Latin America. In exchange, the indictment would be dismissed, Boulier would plead guilty to the lesser charge in the information,[8] and would receive probation. In addition, the United States Attorney in that district apparently assured Boulier that the Government would agree to the dismissal of the indictment pending in the Eastern District of New York. Based upon the latter promise, which was obviously never carried out, Boulier urges that the Government should be estopped from prosecuting him in this proceeding. We put to one side such questions as the authority of one United States Attorney to bind another or the proper remedy for a defendant who has been deceived by such a promise. The record indicates that Boulier failed to carry out his part of the bargain by refusing to disclose the promised information and hence is in no position to invoke the agreement now.[9]

## II.   Evidence of Later Crimes

■ All four appellants challenge the introduction of evidence of a series of post-conspiracy transactions and, in the case of George Nathan, two arrests for possession of cocaine. As to the

5. Such knowledge is required under 21 U.S.C. § 174, see United States v. Agueci, 310 F.2d 817, 824–826 (2d Cir. 1962), cert. denied, 372 U.S. 959, 83 S.Ct. 1016, 10 L.Ed.2d 12 (1963), although in certain situations it can be established by inference based upon possession. See part IV infra.

6. The Court in Gore decided this question on both constitutional and legislative grounds.

7. This situation is to be distinguished from the one dealt with in Ashe v. Swenson, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970), cited by appellant. In that case, six men had been robbed while participating in a poker game. Ashe was tried for robbing one of the victims and was acquitted. He was then tried for robbing another of the players and was convicted. The Supreme Court reversed on the ground that the first jury had determined that Ashe had not participated in the robbery, a necessary element in the conviction by the second jury. In a concurring opinion in Ashe, id. at 448, 90 S.Ct. 1189, as well as in a separate opinion in Abbate v. United States, 359 U.S. 187, 196, 79 S.Ct. 666, 3 L.Ed.2d 729 (1959), Justice Brennan urged the Court to decide that all violations growing out of a single transaction must be tried together. While this may frequently be the preferable practice, see United States v. Jones, supra, 334 F.2d at 812, it has not been held to be required by the Double Jeopardy Clause so long as the proscription of Ashe is not transgressed. See, e. g., United States v. DeMarrias, 441 F.2d 1304 (8th Cir. 1971). See generally Comment, Ashe v. Swenson: Collateral Estoppel, Double Jeopardy, and Inconsistent Verdicts, 71 Colum.L.Rev. 321 (1971).

8. The original indictment charged a conspiracy to violate former 21 U.S.C. § 174, punishable by a minimum sentence of five years in prison. The information charged a conspiracy under 18 U.S.C. § 371 to violate 26 U.S.C. § 4704(a), which did not preclude the possibility of probation.

9. Following Boulier's failure to provide the information, the Florida prosecutor recommended a three-year sentence on his guilty plea, and Judge Joe Eaton sentenced him to two years in prison.

former argument, evidence of a conspirator's post-conspiracy activity is admissible if probative of the existence of a conspiracy or the participation of the alleged conspirator. Lutwak v. United States, 344 U.S. 604, 617–619, 73 S.Ct. 481, 97 L.Ed. 593 (1953); United States v. Bennett, 409 F.2d 888, 893 (2d Cir.), cert. denied, 396 U.S. 852, 90 S.Ct. 113, 117, 24 L.Ed.2d 101 (1969).[10] Hence the prosecution could properly introduce evidence that appellants had, on a number of occasions after August 1968, engaged in drug transactions and other activities that usually accompany such criminal conduct.[11]

■ Appellant George Nathan specifically complains about the Government's use of rebuttal testimony by two police officers, who described the circumstances of Nathan's two post-conspiracy arrests on drug charges. Neither arrest led to a conviction, and Nathan asserts that they should not have been used against him by means of extrinsic proof. However, appellant opened the door to such an inquiry through his own testimony. On direct examination he declared that he did not use cocaine or heroin and had never engaged in the transportation or distribution of any narcotic drug; on cross-examination, while admitting the two arrests, he denied that he had possessed narcotics at the time of his second arrest or that he had known of the presence of drugs in his apartment at his first arrest. The testimony of the officers suggested the strong likelihood that Nathan had in fact been knowingly in possession of cocaine on both occasions, and the trial judge could therefore, in his discretion, admit such testimony to disprove Nathan's assertions. See Walder v. United States, 347 U.S. 62, 74 S.Ct. 354, 98 L. Ed. 503 (1954); United States v. Keilly, 445 F.2d 1285, 1289 (2d Cir. 1971), cert. denied, 406 U.S. 962, 92 S.Ct. 2064, 32 L.Ed.2d 350 (1972) (limiting United States v. Glasser, 443 F.2d 994 (2d Cir.), cert. denied, 404 U.S. 854, 92 S.Ct. 96, 30 L.Ed.2d 95 (1971)).

### III. Brown's Business Card and His 1945 Arrest

■ At trial, the Government introduced into evidence a business card of appellant Robert Brown, who owned a record store. Brown challenges the admission of the card as unwarrantedly prejudicial.[12] The card in question had been taken from Jesus Torrado's apartment when he was arrested. The relevance of the card is that it served as circumstantial evidence of Brown's involvement with Torrado and the conspiracy. Used for this purpose, introduction of the card was proper. See United States v. Canieso, 470 F.2d 1224, 1232 (2d Cir. 1972); United States v. Armone, 363 F. 2d 385, 403–404 (2d Cir.), cert. denied, 385 U.S. 957, 87 S.Ct. 398, 17 L.Ed.2d 303 (1966).

■ Brown called three character witnesses to vouch for his reputation for veracity. On cross-examination, two of them were asked whether they were aware that Brown had been arrested in 1945 for possession of a knife and a revolver and in 1968 for possession of a dangerous weapon. Brown claims that the reference to the earlier arrest was improper because of its remoteness and its tenuous relationship to his veracity. We doubt whether knowledge of such an ancient event of this nature is a prerequisite for a reliable accounting of a defendant's reputation for honesty in the

---

10. Judge Mishler carefully instructed the jury as to the limited purpose for which such evidence could be used.

11. The related activities consisted of exchanging or transferring large sums of cash.
    In a separate argument appellants urge that there was a fatal variance between the indictment and the proof. In substance, however, this point is merely a variation of their argument against the introduction of evidence of post-conspiracy conduct, and it has no merit.

12. He also argues that the card should have been excluded because the Government did not establish a chain of custody. This claim is without merit since the agent who had seized the card had written an identifying number on it, which he recognized at trial.

community. Cf. United States v. Puco, 453 F.2d 539, 543 (2d Cir. 1971) (impeachment of defendant on cross-examination by 21-year old conviction held improper). However, at trial Brown did not specify the grounds now asserted to exclude evidence of the 1945 arrest. See United States v. Silverman, 430 F.2d 106, 125–126 (2d Cir. 1970), cert. denied, 402 U.S. 953, 91 S.Ct. 1619, 29 L. Ed.2d 123 (1971). In addition, he did not object to the much more damaging reference to the 1968 arrest. In view of these circumstances and the trial court's very broad discretion as to the permissible scope of cross-examination of character witnesses to test the basis for their statements, see Michelson v. United States, 335 U.S. 469, 69 S.Ct. 213, 93 L. Ed. 168 (1948), Brown has not made a "clear showing of prejudicial abuse of discretion." Id. at 480, 69 S.Ct. at 221.

### IV. Speedy Trial and Sufficiency Claims

■ Appellant Brown was arrested in June 1970 and indicted in New York two months later. He was not tried until June 1972 and urges that the indictment should have been dismissed, as he requested below, because this delay deprived him of his right to a speedy trial. We disagree.

Although the gap between arrest and trial was two years, there apparently was no purposeful delay and both sides were partly responsible for the slow pace of the proceedings. See Barker v. Wingo, 407 U.S. 514, 531, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). Most significantly, Brown had been scheduled to go to trial in June 1971 with the first group of alleged conspirators, but he requested a severance, which, when granted, led to a substantial delay. Moreover, he demonstrates no constitutionally cognizable prejudice.[13] See id. at 532, 92 S.Ct. 2182. Finally, we note that since the Government was ready for trial in June 1971, there was no violation of this circuit's Rules Regarding Prompt Disposition of Criminal Cases, which went into effect shortly thereafter.[14]

■ Appellants Brown and Nash argue that the Government failed to establish—as it must under section 174, see United States v. Agueci, supra note 5—that they knew that the drugs in question had been illegally imported. This argument ignores the evidence that both appellants were at various times in possession of quantities of heroin. As Judge Mishler charged, this is sufficient to justify an inference that they were aware that it had been illegally imported. See, e. g., Turner v. United States, 396 U.S. 398, 408–418, 90 S.Ct. 642, 24 L.Ed.2d 610 (1970).[15]

### V. Miscellaneous Contentions

■ Finally, appellants offer a number of additional reasons for reversal, including the prosecutor's assertedly prejudicial summation, allegedly improper venue in the Eastern District, and the discovery of "new" evidence with regard to appellant Nash. On the first point, we find that the challenged prosecutorial remarks, when placed in context, are for the most part unobjectionable and that such error as may have occurred was of minor significance. As to venue, the use by the conspirators of John F. Kennedy International Airport for flights to Miami and Detroit to obtain or sell narcotics was a sufficient basis for venue to

---

13. Brown claims only that the delay permitted the Government to call an additional witness. He does not allege that his own preparation was hampered. Moreover, he was free on bail during the two-year period.

14. The effective date of the Rules was July 5, 1971.

15. With respect to the cocaine, Judge Mishler charged that an inference of knowledge may be drawn from the proven possession of at least one kilo of the substance during the pendency of the conspiracy. See United States v. Gonzalez, 442 F.2d 698, 705, 709 (2d Cir.) (en banc), cert. denied, 404 U.S. 845, 92 S.Ct. 146, 30 L.Ed.2d 81 (1971).

lie in the Eastern District.[16]   With regard to the third point, the evidence in question—hospital and doctor's records showing that Nash had been hospitalized for a few days in late July 1969—would have been of little or no help to appellant's case [17] and, in any event, could have been sought during the pendency of the trial.[18]   We have considered the other points raised by appellants, but none warrants further discussion.

Affirmed.

16.  Two such flights were listed in the indictment and proved as overt acts in furtherance of the conspiracy.

17.  A Government witness, Stanton Garland, testified that in "[t]he latter part of July 1969" he saw Nash hand $17,000 to Nash's father (named in the indictment as a co-conspirator), who in turn gave the money to Jesus Torrado, presumably in payment for narcotics.   The fact that Nash was in the hospital for a few days in late July scarcely amounts to a refutation of the testimony in question.

18.  A recess of five days was called after Garland had testified.   Thus, Nash had ample opportunity to obtain the records when he was already aware of their arguable relevance to the Government's case against him.