**UNITED STATES of America,**
**Appellee,**

v.

**Pasquale CIOFFI and Eugene Robert Ciuzio, Appellants.**

**Nos. 984, 985. Indexes 73–1339, 73–1257.**

United States Court of Appeals,
Second Circuit.

Argued June 21, 1973.

Decided July 16, 1973.

Rehearing Denied Oct. 1, 1973.

494

Joel A. Brenner, Mineola, N. Y. (Richard I. Rosenkranz, New York City, of counsel), for appellants.

Peter M. Shannon, Dept. of Justice, Washington, D. C. (Robert Morse, U. S. Atty., E. D. N. Y., and Sidney M. Glazer, Washington, D. C., of counsel), for appellee.

Before FRIENDLY, FEINBERG and MANSFIELD, Circuit Judges.

FRIENDLY, Circuit Judge:

Count 1 of the indictment in this case charged that appellants Cioffi and Ciuzio "knowingly did possess with intent to use and sell, approximately four hundred forged and counterfeited postage stamps of the denomination of six cents" in violation of 18 U.S.C. § 501; count 2 charged that they had conspired to violate the same section by agreeing to commit the acts set forth in count 1. After trial before Judge Dooling and a jury in the District Court for the Eastern District of New York, they were convicted on both counts and were given concurrent sentences.

The Government's evidence was as follows: On October 2, 1970, Michael Fiore, an acquaintance of Cioffi and Ciuzio, met them at Cioffi's barber shop in Plainview, N. Y. Cioffi told Fiore he had some counterfeit stamps and money and asked if Fiore knew anyone who would take the contraband out of the country. Cioffi then handed him a sheet of 100 6¢ stamps and a $100 bill and told him to give the stamps to "your man" and see if he was interested.

Shortly thereafter Fiore met with Secret Service Agent Daniel Marchitello and two other investigators. He told Marchitello that Cioffi and Ciuzio were selling counterfeit stamps and showed him the 100 stamp sample. Marchitello took 50 and gave the other 50 back to Fiore. That evening Marchitello and Fiore met Cioffi and Ciuzio outside the barber shop. Fiore introduced Marchitello as "my man here from Cuba," and the defendants agreed to speak with him. Cioffi said he had $500,000 worth of counterfeit 6¢ stamps and asked if Marchitello could obtain a perforating machine. After a brief negotiation over the price, Ciuzio agreed to a figure of 1½¢ per stamp if Marchitello would buy a large number and take them out of the country. During the discussion, Cioffi indicated that in addition to the stamps, he could produce between $5,000,000 and $15,000,000 of counterfeit currency. If Marchitello would agree to purchase the stamps, Cioffi told him, he would not require him to put up any "front money" for the currency. Marchitello then asked Cioffi for a sample sheet to try on his perforating machine and Cioffi sent Ciuzio to pick one up. Cioffi told Marchitello he wanted a commitment on the stamp purchase as soon as possible; Marchitello agreed to contact his own people and get back to Cioffi later. Ciuzio then returned, handed Marchitello a sheet of 400 counterfeit 6¢ stamps, and demanded an answer by 11 A.M. the next day. Because he feared possible interference with another agent's investigation, Marchitello never reestablished contact with either Cioffi or Ciuzio.

Testifying in their own defense, appellants denied that these events had occurred. They attempted to impeach Marchitello's testimony by focusing on certain inconsistencies in his account of the events of October 2, and attacked Fiore's testimony on the ground that there was bad blood between Cioffi and Fiore because Fiore had refused to repay $2,000 that Cioffi had lent him.

### I.

We must first consider various contentions of appellants based on their earlier trial for a related offense. The earlier prosecution was also brought on a two count indictment and concerned the very same course of conduct. The first count charged that Cioffi and Ciuzio had attempted to sell stamps they knew to be falsely made, forged and counterfeited, in violation of 18 U.S.C. § 472;[1] the second count charged a con-

---

1. For convenience, we set forth below the relevant portions of the text of the statutes forming the basis for the two indictments:

18 U.S.C. § 472: *Uttering counterfeit obligations or securities.*

Whoever, with intent to defraud, passes, utters, publishes, or sells, or attempts to pass, utter, publish, or sell, . . . any falsely made, forged, counterfeited, or altered obligation or other security of the United States, shall be

spiracy to violate the same section. The alleged overt acts were the same in both indictments. The evidence at the trial under the § 472 indictment, also before Judge Dooling, was much the same as under the § 501 indictment.

At the close of the first trial the judge granted a motion by Cioffi for acquittal on the substantive count. Although we might well have concluded otherwise, Judge Dooling ruled that the Government's evidence was insufficient to show an attempt to sell the stamps. The Government then moved for dismissal of the substantive count as to Ciuzio and this was granted.[2] The jury hung on the conspiracy count. Instead of seeking a retrial on that count, the Government abandoned its efforts under § 472 and procured the instant indictment under § 501. Defendants claim that the second prosecution was barred by the Double Jeopardy clause or, in the alternative, that most of the Government's evidence should have been excluded on grounds of collateral estoppel, see Ashe v. Swenson, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970); United States v. Kramer, 289 F.2d 909 (2 Cir. 1961).

■■ The double jeopardy question with respect to the substantive count of the second indictment is not free from difficulty. If the true test remains Chief Justice Shaw's famous formulation in Morey v. Commonwealth, 108 Mass. 433, 434 (1871), quoted with approval in Ex parte Nielsen, 131 U.S. 176, 187–188, 9 S.Ct. 672, 33 L.Ed. 118 (1889); Carter v. McClaughry, 183 U.S. 365, 395, 22 S.Ct. 181, 46 L.Ed. 236 (1902); Gavieres v. United States, 220 U.S. 338, 342, 31 S.Ct. 421, 55 L.Ed. 489 (1911); Ebeling v. Morgan, 237 U.S. 625, 630–631, 35 S.Ct. 710, 59 L.Ed. 1151 (1915); and Blockburger v. United States, 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932), namely, that "the evidence required to support a conviction upon one of them [the indictments] would have been sufficient to warrant a conviction upon the other," the double jeopardy defense must fail. Proof of possession with intent to use or sell is sufficient to support a conviction under § 501, but it would not satisfy the requirements of the charge made under § 472 unless the intent to sell ripened into an attempt. Moreover, proof of an attempt to sell, without evidence of possession,[3] would suffice for a conviction under § 472 but not under § 501.

Although this formulation has never been expressly rejected by the Supreme Court or this circuit, it has been subject to serious criticism.[4] Moreover, the Su-

---

fined not more than $5,000 or imprisoned not more than fifteen years, or both. 18 U.S.C. § 501: *Postage stamps, postage meter stamps, and postal cards.*

. . . . . .

Whoever makes or prints, or knowingly uses or sells, or possesses with intent to sell, any . . . forged or counterfeited postage stamp, postage meter stamp, stamped envelope, postal card, die, plate, or engraving;

. . . . . .

Shall be fined not more than $500 or imprisoned not more than five years, or both.

2. The Government does not dispute that the dismissal granted on its motion had the same effect as the acquittal directed by the judge.

3. Although it would be rare for a seller not to have at least constructive possession, such a case is conceivable, e. g., if A, a middleman, sells B counterfeit owned by and in the possession of C, and the contraband is delivered directly to B by C. The same circumstances could arise, of course, in the case of an attempted sale.

4. See the separate opinion of Mr. Justice Brennan in Abbate v. United States, 359 U.S. 187, 196, 201, 79 S.Ct. 666, 3 L.Ed. 2d 729 (1959); his concurring opinion, joined by Justices Douglas and Marshall, in Ashe v. Swenson, *supra*, 397 U.S. 448, 90 S.Ct. 1189; and Note, Twice in Jeopardy, 75 Yale L.J. 264 (1965). See also Mr. Justice Schaefer's Traynor lecture, Unresolved Issues in the Law of Double Jeopardy: Waller and Ashe, 58 Calif.L. Rev. 391 (1970). No small part of the difficulties in double jeopardy law is traceable to the fact that the same tests have been applied to acquittals and convictions, although the policy considerations relative to reprosecution are quite different.

preme Court has rather conspicuously refrained from employing the *Morey* formulation in recent cases such as United States v. Ewell, 383 U.S. 116, 124–25, 86 S.Ct. 773, 15 L.Ed.2d 627 (1966); Waller v. Florida, 397 U.S. 387, 390, 90 S.Ct. 1184, 25 L.Ed.2d 435 (1970); and Robinson v. Neil, 409 U.S. 505, 511, 93 S.Ct. 876, 35 L.Ed.2d 29 (1973). In at least two cases, Petite v. United States, 361 U.S. 529, 80 S.Ct. 450, 4 L.Ed.2d 490 (1960), and Marakar v. United States, 370 U.S. 723, 82 S.Ct. 1573, 8 L.Ed.2d 803 (1962), the Government has avoided testing the continued validity of the traditional formulation by requesting the dismissal of convictions that might have called for reconsideration of the *Morey* rule. The Government there insisted that its requests for dismissals were based, not on a violation of double jeopardy principles, but on its own policy "that several offenses arising out of a single transaction should be alleged and tried together and should not be made the basis of multiple prosecutions, a policy dictated by considerations both of fairness to defendants and of efficient and orderly law enforcement," 361 U.S. at 530, 80 S.Ct. at 451. In both *Petite* and *Marakar,* three Justices would have rejected the Government's "policy of fairness" approach and would have based reversal directly on the Double Jeopardy clause.[5] In United States v. Sabella, 272 F.2d 206, 211 (2 Cir. 1959), we held that the Double Jeopardy clause prohibited a second prosecution after a conviction stemming from the same narcotics sale. Although this court there reaffirmed the *Morey* doctrine, we refused to extend it to the point of rigid formalism. While the two charged offenses in *Sabella* each technically included one unique element, the Government was not required to prove either in order to make out a *prima facie* case. In effect, then, the same proof could support both convictions.[6] In view of the shadow that has been cast over *Morey,* one is justified in speculating that, unless prosecutors take to heart the recommendations for joinder of all offenses arising out of the same criminal episode or transaction,[7] double jeopardy will be a fertile ground for Su-

5. With the support of Justices Douglas and Marshall, Justice Brennan has continued to hammer away at the Court's reluctance to consider anew what constitutes the "same offence" for double jeopardy purposes. Sounding a theme that originated with his separate opinions in *Abbate* and *Ashe,* he has pressed for adoption of a constitutional requirement of joinder for all charges arising out of a "single criminal act, occurrence, episode or transaction," in concurrences, see Simpson v. Florida, 403 U.S. 384, 387, 91 S.Ct. 1801, 29 L.Ed.2d 549 (1971); Harris v. Washington, 404 U.S. 55, 57, 92 S.Ct. 183, 30 L.Ed.2d 212 (1971); Robinson v. Neil, 409 U.S. 505, 511, 93 S.Ct. 876, 35 L.Ed.2d 29 (1973), and in dissents from denials of certiorari, see Duncan v. Tennessee, 405 U.S. 127, 130, 92 S.Ct. 785, 31 L.Ed.2d 86 (1972) (writ dismissed as improvidently granted); Miller v. Oregon, 405 U.S. 1047, 92 S.Ct. 1321, 31 L.Ed.2d 590 (1972); Grubb v. Oklahoma, 409 U.S. 1017–19, 93 S.Ct. 450, 34 L. Ed.2d 309 (1972).

6. In the recent decision in United States v. Nathan, 476 F.2d 456, 458–59 (2 Cir. 1973), the court rejected a double jeopardy attack on a second narcotics prosecution (for conspiracy to violate 21 U.S.C. §§ 173, 174) allegedly relating to the same conduct as was involved in a prior federal prosecution in Florida where the complaining defendant had pleaded guilty to conspiracy to violate 26 U.S.C. § 4704(a). Because of the essential difference in the nature of conspiracy and substantive offenses, it was not true in *Nathan*—as it was in *Sabella* —that "the government could sustain the second indictment with the selfsame evidence needed to prove the first." 272 F.2d at 210. In addition, there was doubt in *Nathan* whether the second conspiracy charge was the same as the first, see 476 F.2d at 458 n.4; there was no such doubt with respect to the two indictments for substantive crimes in *Sabella.* The *Nathan* court did not address itself to *Sabella,* which counsel failed to bring to its attention.

7. See, e. g., ALI, Model Penal Code §§ 1.07(2), 109 (Proposed Official Draft 1962); ABA, Minimum Standards for Criminal Justice, Joinder and Severance 1.1, 1.3 (1968).

preme Court development in the next decade.

■ Whatever the future of the *Morey* formulation may be in the Supreme Court, the facts of this case afford no such temptation to temper it as existed in *Sabella*. The very basis for the acquittal in the first trial was the judge's belief that the Government had not presented sufficient evidence to show an attempt to sell; he thought apparently that the evidence showed only possession, but that the defendants' alleged acts had not gone far enough to constitute an attempt. There was thus no bar to a new prosecution under § 501 unless, which appellants have not contended and, because of the required showing of possession, could not reasonably contend, the latter was a lesser included offense.

■ In any event, if the concurrent sentence doctrine retains some vitality after Benton v. Maryland, 395 U.S. 784, 789–92, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969), compare United States v. Febre, 425 F.2d 107, 113 (2 Cir.), cert. denied, 400 U.S. 849, 91 S.Ct. 40, 27 L.Ed.2d 87 (1970); United States v. Gaines, 460 F.2d 176, 178–80 (2 Cir.), cert. denied, 409 U.S. 883, 93 S.Ct. 172, 34 L.Ed.2d 139 (1972), the double jeopardy objection to the substantive count under § 501 is of little practical importance. The acquittal under the substantive count of the first indictment would not have barred retrial of the conspiracy count on which the jury had hung, although the Government might have been confronted with serious restrictions on the evidence it could introduce, *cf.* United States v. Kramer, *supra*, 289 F.2d at 915–16. By submitting that count to the jury, the judge clearly indicated his belief that the evidence was sufficient to warrant a finding that defendants had agreed to attempt to sell the stamps, although not to show they had actually made the attempt. As has

been stated countless times, "[t]he essence of the conspiracy charge is an agreement," see Pereira v. United States, 347 U.S. 1, 11, 74 S.Ct. 358, 364, 98 L.Ed. 435 (1954); there can be a valid conviction for conspiracy even though the object is never attained. See Developments in the Law, Criminal Conspiracy, 72 Harv.L.Rev. 920, 925–27, 944–45 (1959). The same reasoning leads *a fortiori* to the conclusion that acquittal on the substantive charge under § 472 would not bar, as a matter of double jeopardy, subsequent trial and conviction on the charge of conspiring to violate § 501.

■■ There remains for consideration, on this branch of the case, appellants' contention that even if the Double Jeopardy clause did not bar the second prosecution, principles of issue preclusion should have prevented the Government from reintroducing the evidence tendered at the first trial. Appellants rely on the portion of our *Kramer* decision which held that, after the defendants were acquitted on several charges related to the burglary of two Connecticut post offices, the Government could not introduce evidence in a subsequent prosecution to prove that the defendants themselves burglarized the post offices or were responsible for whoever did. 289 F.2d at 914–916. *Kramer*, however, is readily distinguishable from this case. Like Ashe v. Swenson, *supra*, *Kramer* was the rare case where it was possible to determine with certainty what the jury in the earlier prosecution had decided.[8] Here there is absolutely no basis for belief that when the judge dismissed the substantive count in the § 472 trial, he determined that the evidence was insufficient to show that defendants possessed the counterfeit stamps with intent to use or sell them. In its endeavor to prove the intent required by § 501, the Government was

8. Compare Justice Schaefer's perceptive remark: "The defense of collateral estoppel will not often be available to a criminal defendant . . . . Collateral estoppel is therefore of limited value because it is not often possible to determine with precision how the judge or jury has decided any particular issue." Schaefer, *supra* note 4, at 394.

not obliged to truncate its evidence and eliminate parts that might show how far the intent had gone.

## II.

Although § 501 is violated by possession "with intent to use or sell," the indictment under which Cioffi and Ciuzio were convicted charged possession "with intent to use and sell." The judge's proposed charge was in the disjunctive. At the request of trial counsel for Cioffi and without objection from counsel for Ciuzio or the Assistant United States Attorney, the judge agreed to delete the words "or sell." However, on two occasions, the phrase "use or sell" remained in the charge; this inconsistency was not called to the court's attention by counsel.

Defendants contend that the striking of the words "and sell" was an impermissible amendment of the indictment within the condemnation of Ex parte Bain, 121 U.S. 1, 7 S.Ct. 781, 30 L.Ed. 849 (1886), and its progeny. Apart from the question whether defendants could be heard to complain of an error which counsel for one of them introduced and in which counsel for the other acquiesced, it appears settled that indictments worded in the conjunctive, charging violations of statutes worded in the disjunctive, can be supported by proof of either of the conjoined means of violating the act. See United States v. Barbato, 471 F.2d 918 (1 Cir. 1973); Gerberding v. United States, 471 F.2d 55 (8 Cir. 1973); United States v. McCann, 465 F.2d 147 (5 Cir. 1972); Joyce v. United States, 454 F.2d 971 (D.C. Cir. 1971); United States v. Price, 444 F.2d 248 (10 Cir. 1971); McGriff v. United States, 408 F.2d 333 (9 Cir. 1969). Since an instruction charging possession with intent to use *or* sell would have been permissible, the amendment of the indictment to charge only possession with intent to use did not constitute prejudicial error.

However, we must reverse the convictions in this case because the judge erred in instructing the jury as to the definition of the word "use." After due objection, he told the jury:

> The Government must show that the defendant intended to use the stamps. If you conclude that there was an intention to use the sheet of stamps, Exhibit One, as a sample to induce the purchase of a larger quantity of similar stamps, then you may find from that evidence that there was an intention to use the stamps within the meaning of the indictment.

Both the context and the history of the statute indicate that "use" in § 501 means use for a postal purpose, not "use" in a broader, colloquial sense. It is hard to believe, for example, that the knowing use of bogus stamps for a table-cover or wall decoration would violate § 501. On this basis, the proffer of a sample of unperforated stamps to induce a sale may be relevant to show an intent (§ 501) or attempt (§ 472) to sell, but it hardly seems to show an intention to "use" for postal purposes. Even if the evidence were sufficient to show an intention to use in the limited sense, the judge's instructions permitted the jury to convict appellants for a kind of "use" that exceeds the contemplation of the statute.

Section 501 can be traced back to § 3 of an 1851 act, 9 Stat. 589–90, penalizing "any person who shall forge or counterfeit any postage stamp . . . or shall make or print, or knowingly use or sell, or have in his possession with intent to use or sell, any such false, forged, or counterfeited . . . stamp." [9] While these words alone are

---

9. The inference that Congress was thinking in terms of postal use is heightened by a still earlier precursor of § 501, 5 Stat. 749 (1845), which provided:

> That if any person or persons shall forge or counterfeit, or shall utter or use knowingly, any counterfeit stamp of the Post Office Department of the United States issued by authority of this act . . . within the United States, or the post office stamp of any foreign Government, he shall be adjudged guilty of felony . . . .

no clearer than § 501 with respect to the meaning of "use," significant aid is provided by the immediately succeeding section of the same act, which penalizes any person who "shall use, or attempt to use, in prepayment of postage any postage stamp which shall have been before used for like purposes." [10]

The 1851 legislation was carried forward into a massive act of June 8, 1972, entitled "An Act to revise, consolidate and amend the Statutes relating to the Post-office Department." Section 178, the analogue of present § 501, penalized

> any person who shall forge or counterfeit any postage stamp, . . . ; [any person] who shall make or print, or knowingly use or sell, or have in . . . possession with intent to use or sell, any such . . . forged or counterfeited postage-stamp . . .

17 Stat. 305 (1872). In the preceding § 177 Congress indicated rather clearly what it meant by "use" by saying, in language drawn from § 4 of the 1851 statute, that

> any person who shall use or attempt to use, in payment of the postage on any mail-matter conveyed, by mail or otherwise, any postage-stamp or

stamped envelope, or any stamp cut from any such stamped envelope, which has been before used for a like purpose, shall forfeit and pay fifty dollars.

Although § 177 migrated to a different title in the Revised Statutes of 1875, while § 178 became § 5464, it is reasonably clear that the previous meaning of postal use was continued.[11]

There was no evidence in this case that defendants had any intention to use the counterfeited stamps for large scale mailing of letters; the evidence was rather that they were intent on a sale. In short, when the judge redacted the indictment, he cut out the wrong word; the case should have been submitted to the jury on the basis of possession with intent to sell rather than possession with intent to use. If the judge's action was based on a belief of insufficiency of the evidence to show possession with intent to sell, he was mistaken. From the evidence presented at trial, the jury could permissibly infer that defendants intended to sell the sheet of 400 counterfeit stamps they gave to Marchitello and that they had access to a much larger number of

The fact that here there was no prohibition of sale indicates that, in condemning "use" of counterfeit stamps, the purpose of Congress was to protect the postal revenues.

10. An 1847 act, which the 1851 statute superseded, further supports the limited construction of the word "use" in the early postal laws. Like the 1851 act, that statute first provided that the Postmaster General should prepare and distribute stamps for the prepayment of postage. Clearly referring to "use" in the postal sense, the act authorized a deputy postmaster to "sell or dispose of any stamps so received . . . to any person who may wish to *use* the same." (Emphasis supplied). The act then added two penal provisions. The first made it unlawful "for any deputy postmaster to prepare, *use,* or dispose of any postage stamps not authorized by and received from the Postmaster General"; the second contained a more general prohibition against making, uttering, or forging any postage stamp. 9 Stat. 201 (1847).

11. Section 177 became § 3923 of the Revised Statutes. While § 178 appeared in the title dealing with federal crimes, § 177 was placed in title 46, which collected the statutes relating to the postal service. Also incorporated in that title was § 3924, which was drawn from § 4 of the 1851 act, and which, once again, clearly indicated that the word "use" was intended to be limited to postal use. Section 3924 made it illegal for Post Office employees to

> willfully and knowingly use, or cause to be used, in prepayment of postage, any postage-stamp, . . . which has already been once used for a like purpose or [to] remove, or attempt to remove, the canceling or defacing marks from any such postage-stamp . . . with intent to use or cause the use of the same a second time, or to sell or offer to sell the same, or [to] remove from letters or other mail . . . the stamps attached to the same in payment of postage with intent to use the same a second time for a like purpose, or to sell, or offer to sell, the same.

stamps which they offered to sell to Marchitello's "people."

 There remains the question whether defendants can be tried again under the same indictment, with the jury this time instructed that it can convict on proof of intent to sell, a charge which the judge erroneously removed from the indictment at the defendants' request and which we direct him to restore. Plainly they can be. It is settled that when a defendant has his conviction reversed on appeal, the double jeopardy clause does not prevent his retrial for the same offense. See Mayers & Yarbrough, Bis Vexari: New Trials and Successive Prosecutions, 74 Harv.L.Rev. 1, 4–8 (1960). We see no tenable distinction between a case like this where defendants have procured a reversal because the judge submitted the indictment to the jury on a wrong theory and one where they procured reversal because the judge submitted a defective indictment, as in the classic case of United States v. Ball, 163 U.S. 662, 672, 16 S.Ct. 1192, 41 L.Ed. 300 (1896). Indeed, this case is *a fortiori* to Bryan v. United States, 338 U.S. 552, 70 S.Ct. 317, 94 L.Ed. 335 (1950), which sustained the power of courts of appeals to reverse and remand for a new trial although the prosecution's evidence at the first trial was insufficient.

In view of our disposition of the case, we need not discuss appellants' other points beyond saying that we agree with the judge's ruling which admitted Marchitello's testimony concerning Cioffi's offer to sell him the counterfeit currency, see United States v. Deaton, 381 F. 2d 114 (2 Cir. 1967); United States v. Kaufman, 453 F.2d 306, 310–11 (2 Cir. 1971), and the many cases there cited. We also agree with the trial court's ruling that, after Cioffi had testified about his $2,000 loan to Fiore, the Government could ask whether Cioffi had not charged interest at the rate of $60 a week.

The convictions are reversed and the cause is remanded for a new trial consistent with this opinion.

## ON PETITION FOR REHEARING

PER CURIAM:

The defendants' petition for rehearing is addressed solely to the portion of our decision, slip opinion at 501, which held that they could be retried for violation of 18 U.S.C. § 501 on the basis of having possessed counterfeit stamps with intention to sell; they contend that the judge's redaction of the indictment constituted an acquittal, even though it came about in consequence of their erroneous argument that the evidence was insufficient to show possession with intention to sell.

 Petitioners' initial error is in reading the statute as if it defined two offenses, whereas in fact it defines only one; an accompanying intention either to use or to sell is sufficient to make the possession of counterfeit stamps a crime. Since the judge allowed the case to go to the jury and the jury convicted, neither the judge nor the jury could have intended to acquit the defendants of possession with guilty intention. Indeed, the judge made clear that he believed the jury could find that the defendants possessed the counterfeit stamps with an intention to use them "to induce the sale of larger quantities" over which the jury could have found they had constructive possession; this is all that is needed to justify a conviction of possession with intention to sell.

The case is thus analogous to one where a defendant procures a reversal on the basis of a faulty instruction rather than to an erroneous direction of acquittal; and the principle of United States v. Ball, 163 U.S. 662, 671–672, 16 S.Ct. 1192, 41 L.Ed. 300 (1896), particularly as explicated by Mr. Justice Harlan in United States v. Tateo, 377 U.S. 463, 465–466, 84 S.Ct. 1587, 12 L.Ed. 2d 448 (1964), forbids acceptance of the defendants' argument. See also United States ex rel. Jackson v. Follette, 462 F. 2d 1041 (2 Cir.), cert. denied, 409 U.S. 1045, 93 S.Ct. 544, 34 L.Ed.2d 496 (1972).

The petition for rehearing is denied.