Mack STUBBS, Petitioner,

v.

David HARRIS, Superintendent, Green Haven Correctional Facility and Attorney General of the State of New York, Respondents.

No. 78 Civ. 4391.

United States District Court, S. D. New York.

Oct. 24, 1979.

Heath, Horn & Rosenthal, Syracuse, N. Y., for petitioner; Alan Rosenthal, Syracuse, N. Y., and Elizabeth M. Fink, New York City, of counsel.

Robert Abrams, Atty. Gen. of the State of New York, New York City, for respondents; Robert J. Schack, Asst. Atty. Gen., New York City, of counsel.

WHITMAN KNAPP, District Judge.

On December 8, 1972, at about 5:30 P.M., Ernest Ballestero was stabbed to death on a Brooklyn street. Two months later, petitioner Mack Stubbs was arrested and charged with Ballestero's murder. He was tried before a jury in State court, convicted, and sentenced to a term of fifteen years to life imprisonment, which he is presently serving. He now petitions this court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on two grounds. He claims that he was denied his right to a speedy trial in violation of the Sixth Amendment of the United States Constitution; and that his representation at trial by court appointed counsel was so ineffective and so clearly below the minimum standards of competence as to render the proceedings a farce and mockery of justice.

Petitioner's speedy trial claim is based on an eighteen month delay between arrest and trial during which time one David MacDougald—who, according to petitioner, would have provided essential alibi testimony—became unavailable through death. Petitioner's principal ineffective assistance claim is based on the assertion that his court appointed attorney did not properly prepare—or even personally interview prior to the morning of the trial—the one alibi witness who actually testified, with the con-

sequence that the witness' testimony was wholly destroyed. For reasons that follow, we must reject both claims.

### The State Court Proceedings

On February 14, 1973—some two months after the event—petitioner was arrested and charged with Ballestero's murder. He was arraigned on March 9, 1973, in New York Supreme Court, Kings County. Bail was set at $25,000, and an attorney, Barry Agulnick, Esq., was appointed by the court to represent him pursuant to Article 18–B, § 722, of the County Law of New York. Petitioner could not make bail and was remanded to the Brooklyn House of Detention. In May of that year, petitioner moved pro se for a bill of particulars, and in June and August he moved, again pro se, for a reduction of bail. These motions were denied. On August 24 petitioner's counsel made an omnibus motion for a bill of particulars, for discovery, and for the suppression of certain evidence. This motion was not decided until December 3. On October 1, counsel moved for the assignment of an investigator pursuant to Article 18–B, § 722, of the County Law, and on November 1 one Herman H. Race was appointed as such.

On October 10, petitioner filed pro se a habeas corpus petition with the Appellate Division, seeking his release on the ground that he was being denied his constitutional right to a speedy trial. On November 12, this motion was denied by the Appellate Division for failure to comply with New York Civil Practice Law and Rules § 7002, and referred to New York Supreme Court to be treated as an order to show cause why petitioner should not be released. On referral, the motion was denied on December 3 by order entered January 15, 1974.

On November 26, 1973, petitioner had moved pro se for a change of counsel. That motion was granted and new counsel, Barry Kamins, Esq. was assigned on December 18. On January 18, 1974, petitioner, pro se, resubmitted to New York Supreme Court, Kings County, his habeas corpus petition based on the speedy trial claim. He was informed by the Court Clerk in a letter dated January 24 that the Court would not entertain pro se applications by defendants who were represented by counsel, and that his motion papers had been forwarded to his attorney of record, Mr. Kamins. On July 16, the People stood ready to go to trial, but petitioner requested an adjournment because an alibi witness was on vacation. That request was granted and the trial began on August 26.

At trial, the case against petitioner rested almost entirely on the testimony of two eye-witnesses, Lois Ormond and Hattie Freeman. These witnesses testified substantially as follows: they had met petitioner for the first time on December 7, 1972; on the following afternoon—the day of the murder—they had spent several hours in Ms. Freeman's apartment, drinking and socializing with petitioner, Ernest Ballestero (the deceased) and one James McNeil, allegedly a cousin of petitioner's; at about 5:30 P.M. the five decided to go out to buy food and more liquor; as they were walking in the street, they heard Ballestero exclaim "Oh"; they then saw petitioner pull a long knife out of Ballestero's chest; and petitioner thereupon ran down the street, shouting, "I got him; I got him." Neither Freeman nor Ormond saw the actual stabbing. James McNeil, allegedly the fifth member of the group, did not testify at trial. However, Freeman testified that she had seen McNeil a few weeks prior to trial, and Ormond testified that she had last seen him three or four months before the trial.

In his defense, petitioner called a single witness, one Willie McNeil, who was no relation to James McNeil. Willie McNeil's direct testimony was to the effect that on December 8, 1972, the day of the murder, he had worked and socialized with petitioner from early in the morning until late in the evening; he and petitioner had been installing carpets in Jersey City and Newark, New Jersey, on that date; and after work at about 7:30 P.M., had gone to visit David MacDougald at the latter's home in Newark. McNeil explained that he was employed as a carpet installer by Perry Carpet

Co., a Long Island firm, and that he in turn in December of 1972 had employed petitioner as his assistant. McNeil also testified that he had asked his employer to show him the route slips for December 8, 1972, to refresh his memory, but that he had been told that they no longer existed. Both the direct and cross examinations of McNeil were supposedly concluded on Friday, August 30. However, when court resumed on Tuesday, September 3, he was recalled by the People for further cross-examination. McNeil then testified that over the weekend he had discovered that his work records for December 8, 1972, in fact existed, and that he had consulted them.[1] McNeil then proceeded to admit error in having claimed to have worked in New Jersey on the day of the murder, since the records showed that he had been laying carpets in Brooklyn on that day. He insisted, however, that petitioner had been working with him—albeit in Brooklyn rather than New Jersey—at the time of the murder. He further testified that the New Jersey jobs to which he had originally referred had been performed on the following day, December 9. McNeil did not make any further reference, either on cross or re-direct examination, to any visit to MacDougald's home in Newark.

MacDougald could not be called to testify because, according to petitioner, he had died in April of 1974, some fourteen months after petitioner's arrest, and four months before the trial.

The jury found petitioner guilty of murder, and he was sentenced on October 7, 1974. On November 15, 1974, petitioner made a *pro se* application to the Supreme Court, Kings County, to vacate judgment on several grounds directed to the weight of the evidence but not to denial of speedy trial or ineffective assistance of counsel. This motion was denied on March 11, 1975, by order entered March 21, 1975, on the ground that *coram nobis* does not lie to correct such errors while an appeal is available or pending.

On October 15, 1974, petitioner appealed to the Appellate Division from his conviction. On this appeal he was represented by Legal Aid counsel. Initially, the appeal was based on the grounds that petitioner had been denied effective assistance of counsel, that the two in-court identifications should have been suppressed, and that he had been unfairly prejudiced by the prosecutor's improper references to him. Subsequently, on June 22, 1976, the Appellate Division granted a motion by petitioner to enlarge the record on appeal to include the oral argument and decision on his speedy trial motion.[2] On March 21, 1977, the Appellate Division unanimously affirmed the judgment. *People v. Stubbs* (2d Dept. 1977) 56 A.D.2d 897, 393 N.Y.S.2d 41. Leave to appeal to the Court of Appeals was denied.

## Discussion

### A) The Speedy Trial Claim

In *Barker v. Wingo* (1972) 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101, the Supreme Court identified four factors to be applied and balanced by courts on an *ad hoc* basis in determining whether a defendant has been deprived of his constitutional right to a speedy trial, 407 U.S. at 530, 92 S.Ct. at 2192: "Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." In the case before us, almost eighteen months elapsed between arraignment and trial. While this is a substantial period of time— especially for a defendant forced to await trial in jail—such a delay does not, without a showing of prejudice to the defendant or willfulness by the prosecution, automatically violate a defendant's speedy trial right. Considerably longer delays have been countenanced by the Court of Appeals for this Circuit. See, e. g., *United States ex rel. Spina v. McQuillan* (2d Cir. 1975) 525 F.2d 813 (twenty-six months); *United States v. Nathan* (2d Cir. 1973) 476 F.2d 456, 461,

---

1. The trial record does not disclose what prompted McNeil to make this week-end search for and examination of the work records.

2. It is not altogether clear to what "speedy trial motion" this order refers. However, the order does establish that the speedy trial question was duly presented to the Appellate Division.

*cert. den.* 414 U.S. 823, 94 S.Ct. 171, 38 L.Ed.2d 56 (two years); *United States v. Fasanaro* (2d Cir. 1973) 471 F.2d 717 (four years); *United States v. Saglimbene* (2d Cir. 1972) 471 F.2d 16, *cert. den.* (1973) 411 U.S. 966, 93 S.Ct. 2146, 36 L.Ed.2d 686 (six years). Petitioner makes no allegations that the prosecution deliberately delayed the trial in order to gain some tactical advantage, or that it had reason to know that a delay would somehow unduly prejudice him. *Cf. United States v. Roberts* (2d Cir. 1975) 515 F.2d 642.

It follows that in order for petitioner to be entitled to habeas corpus relief based on his speedy trial claim, he first would have had to make a showing of actual prejudice caused by the eighteen month delay. *See McDonald v. State of Arkansas* (8th Cir. 1974) 501 F.2d 385, *cert. den.* 419 U.S. 1004, 95 S.Ct. 325, 42 L.Ed.2d 280; *Perry v. State of Texas* (5th Cir. 1972) 456 F.2d 879. He has, however, failed to demonstrate that he was in any way so prejudiced. His only substantial[3] claim of prejudice is that he was prevented from calling MacDougald to testify about the visit of petitioner and Willie McNeil to MacDougald's home in Newark on the evening of December 8, 1972, the day of the murder. However, McNeil's testimony on his second appearance at trial established that this visit must have occurred—if at all—on the following day, *i. e.*, December 9. Consequently, MacDougald's testimony would have been of no use to petitioner at his trial.

B) *The Ineffective Assistance of Counsel Claim*

■ Petitioner's principal[4] claim as to ineffective assistance of counsel at first ap-

peared to present a serious problem. If in fact petitioner's counsel had failed to prepare—or even personally interview prior to the morning of trial—petitioner's only witness with the result that the testimony of a possibly truthful witness was destroyed, a miscarriage of justice of constitutional dimensions might well have occurred. *See, e. g. McQueen v. Swenson* (8th Cir. 1974) 498 F.2d 207; *United States v. DeCoster* (D.C. Cir.1973) 159 U.S.App.D.C. 326, 487 F.2d 1197; *Johns v. Perini* (6th Cir. 1972) 462 F.2d 1308, *cert. den.* 409 U.S. 1049, 93 S.Ct. 519, 34 L.Ed.2d 501; *Gomez v. Beto* (5th Cir. 1972) 462 F.2d 596; *Coles v. Peyton* (4th Cir. 1968) 389 F.2d 224; *cf. Bevenino v. Saydjari* (S.D.N.Y.1977) 76 F.R.D. 88, *aff'd on other grounds* (2d Cir. 1978) 574 F.2d 676; *People v. Douglas* (1st Dept. 1963) 19 A.D.2d 455, 244 N.Y.S.2d 55. We therefore conducted an evidentiary hearing on that claim. At that hearing we were satisfied that petitioner's trial counsel, Barry Kamins, Esq., was not negligent or ineffective in representing petitioner, but that the cross-examination fiasco occurred as the result of the inexcusable neglect of duty of Herman Race, the investigator who had been appointed under Article 18–B of the County Law, and to whom Kamins had reasonably entrusted the task of ascertaining the existence or non-existence of records pertaining to the day about which witness McNeil was to testify.

Kamins testified at the hearing that in preparation for trial he had spoken to McNeil several times over the telephone and had met with him once at McNeil's home in Brooklyn. Kamins also testified that prior to trial he had telephoned Robert Harrison, the owner of McNeil's employer,

---

**3.** Petitioner also claimed that if the trial had taken place earlier, McNeil would have been more likely to remember where he and petitioner had worked on the day of the murder. We are, of course, mindful that "[t]here is . . . prejudice if defense witnesses are unable to recall accurately events of the distant past." *Barker v. Wingo* (1972) 407 U.S. 514, 532, 92 S.Ct. 2182, 2193, 33 L.Ed.2d 101. However, we do not believe that McNeil would have remembered with any greater accuracy where he and petitioner had been on December 8, 1972, had the trial taken place any earlier than it did.

Indeed, it is wholly possible that McNeil would already have been subject to this quite natural confusion when petitioner was arrested some two months after the event. Moreover, as the hearing before us established (*see infra* pp. 526 527), it was not the passage of time which in any way impeded discovery of the work records which ultimately cleared up the witness' confusion.

**4.** Petitioner's other "ineffective assistance" claims do not merit discussion.

Perry Carpet, to inquire whether records concerning McNeil's activities on the day of the murder existed. Upon receiving an affirmative answer, he had by letter dated February 20, 1974, instructed Race to investigate Stubbs' alibi. In the letter, Kamins erroneously gave Perry Carpet's address as 465 Franklin Avenue, Brooklyn, rather than 465 Franklin Avenue, Franklin Square, Long Island, and he mistakenly indicated that Mr. Harrison was connected with Ideal Carpets, another company located at the same address. However, Harrison's telephone number (which has a New York City exchange) was correctly given in the letter, as, apparently, was McNeil's address. Kamins further testified that Race had subsequently informed him that he had gone to the carpet company and spoken to someone there, and that he had been told that the records regarding McNeil's activities on the day in question could not be located.

Mr. Harrison, the next witness called, could not remember much about the events of 1974, except that he had a vague recollection that his secretary had been contacted by someone concerning the company's records. He was quite positive, however, that records relating to McNeil's December 1972 activities had at all times been available, and that if Race—or anyone else—had come to Perry Carpet and asked for them, they would have been produced. He was positive that Race had never spoken to him, and had no knowledge of Race's ever having been on the premises of Perry Carpet.

The next witness was Race, whose credentials as an investigator included eighteen years experience as a member of the Detective Division of the New York City Police Department, the last as a supervisor of detectives. He testified that he had gone to the Brooklyn address provided in Kamins' letter, had spoken to a man (not Harrison) there, had been told that no records pertaining to McNeil's 1972 employment could be located, and had duly report-

ed this fact to Kamins. When pressed, he explained that he had initially remembered this visit as having been to a place on Utica Avenue, but that he (after hearing the previous witnesses) now realized that it was on Franklin Avenue. He was positive, however, that his visit had been to a carpet store in Brooklyn, and nowhere else on Long Island.[5] He was also at first unable to recall Harrison's name, but after being shown a copy of Kamins' letter, he said that it had refreshed his memory, and that he now remembered having asked for Mr. Harrison and being told that he was unavailable.

Based on the foregoing evidence we conclude that Kamins cannot be charged with any sort of professional neglect or misfeasance. With 20/20 hindsight it is possible to speculate that he could have obtained the necessary information by pressing for it in his initial telephone conversation with Harrison. But he did not know that at the time, and he certainly cannot be faulted for having assigned the task of checking records to an apparently qualified professional investigator.

However, we must conclude that Race utterly failed to discharge his responsibilities. It was apparent to us at the hearing that he really had no recollection of the events to which he was testifying, and was simply reconstructing these events from the testimony he had heard (Kamins' and Harrison's) and from the document before him (Kamins' letter). The difficulty is that the objective facts belie his reconstruction. We are satisfied that Race never went anywhere near McNeil's place of employment (or any other carpet company),[6] that he never even called Harrison at the telephone number provided in Kamins' letter, and that he simply gave Kamins false information when he claimed to have ascertained that the records were unavailable.

██ Since no State judge has been asked to consider the effect of Race's behavior

---

5. Our own inquiry to the telephone company reveals that—at least as of this writing—there is neither a Perry Carpet Co. nor an Ideal Carpets anywhere in Brooklyn, and that no

carpet store or company of any sort exists on the 400 block of Brooklyn's Franklin Avenue.

6. See note 5, supra.

upon petitioner's conviction, it cannot be said that petitioner has exhausted the available State remedies in this regard, and we are unable to rule under 28 U.S.C. § 2254 as to the possible consequences, if any, of such behavior. We note, however, that even if the investigator's negligence had been raised in State court, it would probably not—at least on the record presently before us—have authorized us to grant petitioner habeas corpus relief.

It might well be argued that an investigator appointed pursuant to Article 18–B of the County Law to provide investigative services for a criminal defendant who would otherwise be financially unable to obtain them owes such defendant a duty of care similar to that of an attorney appointed under the same article to represent him. The Supreme Court has often held that criminal defendants may not be denied the opportunity adequately to defend themselves or to appeal their convictions because of their poverty. *See, e. g., Argersinger v. Hamlin* (1972) 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (right to counsel); *William v. Oklahoma City* (1969) 395 U.S. 458, 89 S.Ct. 1818, 23 L.Ed.2d 440 (right to a trial transcript necessary to appeal a conviction); *Roberts v. LaVallee* (1967) 389 U.S. 40, 88 S.Ct. 194, 19 L.Ed.2d 41 (right to a preliminary hearing transcript); *Long v. District Court of Iowa* (1966) 385 U.S. 192, 87 S.Ct. 362, 17 L.Ed.2d 290 (right to a transcript of a habeas corpus proceeding necessary for appeal); *Draper v. Washington* (1963) 372 U.S. 487, 83 S.Ct. 774, 9 L.Ed.2d 899 (right to a transcript of the trial record); *Lane v. Brown* (1963) 372 U.S. 477, 83 S.Ct. 768, 9 L.Ed.2d 892 (right to a transcript of *coram nobis* hearing); *Douglas v. California* (1963) 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (right to counsel); *Gideon v. Wainwright* (1963) 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (right to counsel); *Griffin v. Illinois* (1956) 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (right to a transcript). Relying on the principles underlying these cases, the Court of Appeals for the Ninth Circuit has held that "the effective assistance of counsel guarantee of the Due Process Clause requires, when necessary, the allowance of investigative expenses or appointment of investigative assistance for indigent defendants in order to insure effective preparation of their defense by their attorneys." *Mason v. State of Arizona* (9th Cir. 1974) 504 F.2d 1345, 1351. It might well be a corollary to the above rule of law that gross incompetence of an Article 18–B investigator such as Race would violate the Due Process Clause.

However, in view of the stringent "farce and mockery" standards set by the Court of Appeals for this Circuit regarding the point at which an attorney's incompetence or ineffectiveness is deemed to violate Due Process, *see, e. g., Rickenbacker v. Warden, Auburn Correctional Facility* (2d Cir. 1976) 550 F.2d 62, 65, *cert. den.* 434 U.S. 826, 98 S.Ct. 103, 54 L.Ed.2d 85, it seems to us unlikely that habeas corpus relief could be granted to petitioner in the case before us. Although woefully inadequate, Race's conduct did not "make the trial a farce and a mockery of justice."[7] *Rickenbacker, supra,* 550 F.2d at 65, quoting *United States v. Wight* (2d Cir. 1949) 176 F.2d 376, 379, *cert. den.* 338 U.S. 950, 70 S.Ct. 478, 94 L.Ed. 586.

Be that as it may, habeas corpus relief must be denied on the ground that petitioner has failed to exhaust his State remedies on any claim based on the investigator's breach of duty, and the petition is accordingly dismissed.

SO ORDERED.

---

7. It cannot, of course, be said with any confidence that a single alibi witness—even if unscathed on cross-examination—would have overcome the testimony of two eyewitnesses who claimed a two-day acquaintance with the petitioner.