**UNITED STATES of America**

v.

**Alfred R. PAIVA.**

**Crim. No. 494–68.**

United States District Court
District of Columbia.

Jan. 4, 1969.

Arthur L. Burnett, Asst. U. S. Atty., for the United States.

William J. Garber, Washington, D. C., for defendant.

## MEMORANDUM OPINION

GASCH, District Judge.

Defendant Paiva has moved to dismiss this indictment as one brought in breach of an agreement between defendant and the United States Attorney. The motion was argued, testimony taken and briefs submitted. This is a case of first impression.

It appears that between June 16 and 20, 1967, Paiva allegedly forged and uttered a number of stolen United States Savings Bonds which, in the name of the payee, have been designated the "Fien" bonds. By October 13, 1967, when a Secret Service Agent was assigned to investigate the "Fien" bonds, however, Paiva was already in jail on other charges; indeed, it appears he was facing two cases involving narcotics, one forgery, one interstate transportation of stolen Treasury checks, two other felony cases and seven or eight cases pending in the Court of General Sessions. This series of problems prompted Paiva's counsel to negotiate with the United States Attorney. Defendant admitted his guilt and it was agreed that if he would plead to four felonies and cooperate with the Secret Service and F.B.I. in administratively closing cases against him, the U. S. Attorney would dismiss and drop the remaining counts and pending cases against him and would not authorize prosecution of cases in the future based on paper forged prior to November 7, 1967. Paiva agreed with the caveat that his cooperation would not include informing on others who might have been involved with him. The U. S. Attorney agreed.[1]

---

1. Secret Service Agent Hofmann testified this was not his understanding and that had he known, he would never have agreed to it. Although this is the source of the confusion which followed, it appears from other testimony that through meetings attended by the Secret Service, the F.B.I., the U.S. Attorney, Paiva and his counsel, the Secret Service was well aware of the agreement but perhaps continued not to favor it.

On October 24, 1967, the Secret Service Agent visited Paiva at the D. C. Jail.[2] As on later occasions, he gave Paiva stacks of bonds which Paiva examined separating out those he had forged. Over thirty bonds were identified in this manner. When the Agent began to question Paiva about other participants, however, Paiva balked. The Agent's continued pressure on Paiva for information outside of the agreement prompted Paiva's counsel to call the U. S. Attorney. As a result, the agreement was reaffirmed as originally described and as understood by Paiva and his attorney.

On November 7, 1967, Paiva pleaded guilty to four felonies and was sentenced.[3] The remaining counts were dismissed. Between this date and December 20, 1967, the Secret Service and F.B.I. made several other visits to Paiva in the Jail. On each of these occasions he gave information concerning his participation but refused to inform on others, particularly his wife. At some point during this period he was asked for handwriting exemplars. While the U. S. Attorney and defense counsel were drafting a protective order, however, the Secret Service withdrew its request, indicating that it had obtained samples of Paiva's handwriting from letters addressed to his wife seized in a raid of his apartment in June, 1967. On Janu-

ary 17, 1968, after several more fruitless attempts to cajole Paiva into informing on other participants, the Secret Service filed the complaint in this case based on the "Fien" bonds. Upon a representation by the Secret Service that Paiva had not cooperated, the U. S. Attorney authorized this prosecution.[4]

## I.

■ The Government argues that the defendant's position is not judicially cognizable because even assuming *arguendo* that the defendant fulfilled his part of the bargain, the U. S. Attorney may breach such promises with impunity. As authority the Government cites the 1878 *Whiskey Cases* from the Supreme Court, the 1942 *Buckley* case from this Circuit, several cases from other circuits relying on the *Whiskey Cases* and the Federal Probation Act of 1925.[5] Since the Court presumes only the highest standards of fair play and ethical conduct on the part of the U. S. Attorney,[6] it interprets the Government's position to be that where there are two or more accomplices in crime and one agrees to testify against the others in return for a promise of leniency or immunity from prosecution, that accomplice may not raise the promise as a bar to a subsequent prosecution. Rather, in the royal traditions of approvement and usage, he must apply for executive

2. Paiva's attorney was not present but he was told counsel could be present if he wished. *Miranda* issues going to suppression of evidence are not now before the Court.

3. Crim. No. 415–67; 1073–67; 1213–67; 1413–67: Two to six years concurrently on each.

4. The indictment was filed on April 29, 1968, more than ten months after the commission of the alleged offense. Dixon v. District of Columbia, 394 F.2d 966, 969, n. 7 (D.C.Cir. 1968). The Government, however, concedes the existence of the agreement; the issue of speedy trial is not now before the Court.

5. United States v. Ford, 99 U.S. 594, 25 L.Ed. 399 (1878); District of Columbia

v. Buckley, 75 U.S.App.D.C. 301, 128 F. 2d 17 (D.C.Cir.), cert. denied Buckley v. District of Columbia, 317 U.S. 658, 63 S.Ct. 57, 87 L.Ed. 529 (1942); Huerta v. United States, 322 F.2d 1 (9th Cir. 1963), cert. denied 376 U.S. 954, 84 S.Ct. 974, 11 L.Ed.2d 973 (1964); United States v. Marzec, 249 F.2d 941 (7th Cir. 1957), cert. denied 356 U.S. 913, 78 S.Ct. 670, 2 L.Ed.2d 586 (1958); King v. United States, 203 F.2d 525 (8th Cir. 1953); Buie v. United States, 76 F.2d 848 (5th Cir.), cert. denied 296 U.S. 585, 56 S.Ct. 97, 80 L.Ed. 414 (1935); 18 U.S.C. § 3651 (1968).

6. Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935).

pardon or raise it at the time of sentencing as a plea for clemency.[7]

The Court need not dwell on the questionable validity of this ancient doctrine for it is inapposite to the facts now presented for decision.[8] This case involves neither codefendants, nor accomplices, nor promises of leniency, nor agreements to testify for the Government, nor unequal treatment for similarly situated defendants nor approvement nor usage.

If stated more broadly, the Government's position, like the dicta of the cases on which it relies, contradicts more modern decisions of unquestioned validity.[9] If, on the other hand, the narrow holding of those cases is subtracted, what remains is simply the statement that the prosecutor must at all times inform the defendant of his rights and must uphold the good faith responsibilities of his office. Accordingly, the Court finds the present situation so dissimilar from that of the *Whiskey Cases* that they present no barrier to its decision.

The Government places particular emphasis on District of Columbia v. Buckley.[10] The prime issue in that case, however, in which this member of the Court was both trial and appellate counsel was whether jeopardy had attached for the reason that the Government had accepted a plea to driving on the wrong side of the street and thereafter decided to press the more serious traffic charge of driving while intoxicated. Only briefly did our Court of Appeals consider the question of the power of the prosecutor to file the additional traffic charge. The Court observed that no determination could be made on the record before the Court as to this issue. Here, however, the Assistant United States Attorney in charge of the case testified as a witness and confirmed the defense position that an agreement had been made wherein if defendant entered a plea of guilty to four specified felonies, the Government would drop the remaining cases, including those now involved in this motion. It is noted that defendant is now serving time in the cases in which he entered a plea of guilty.

The Government has also sought to draw from these cases the argument that the relief the defendant here seeks directly violates the doctrine of separation of powers.[11] Since this issue underpins both the Court's jurisdiction and the resolution of the merits, it deserves scrutiny.

---

7. Note 5, supra.

8. The most recent case, Huerta v. United States, 322 F.2d 1 (9th Cir. 1963), cert. denied 376 U.S. 954, 84 S.Ct. 974 (1964), for instance, involved the allegation that the Government had promised "leniency." The court doubted seriously such a promise had been made, noted that the agent had no authority to make it but avoided final resolution of this by relying on the *Whiskey Cases*. Similarly, it is important to note the distinction between a prosecutor offering assurances of judicial clemency, an offer he has no power to make, and assurances of not prosecuting, a matter within his control. See also Dixon v. District of Columbia, 394 F.2d 966, 968 (D.C.Cir. 1968).

9. E.g., Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Presumably a defendant could move to withdraw his previous pleas: Briscoe v. United States, 391 F.2d 984 (D.C.Cir. 1968); Guilty Plea Bargaining: Compromises by Prosecutors to Secure Guilty Pleas, 112 U.Pa.L.Rev. 865 (1964). While it is of course not controlling, it is of interest to note that the Report on the Prosecution Function, (Tentative Draft), ABA Project, Minimum Standards of Criminal Justice suggests the following standard:

4.3(c) If the prosecutor finds he is unable to fulfill an understanding previously agreed upon in the plea discussions, he should give notice promptly to the defendant and cooperate in securing leave of the court for the defendant to withdraw any plea and take other steps appropriate to restore the defendant to the position he was in before the understanding was reached or plea made.

(hereinafter cited as ABA Project).

10. District of Columbia v. Buckley, supra, n. 5.

11. See notes 5–8, supra.

On other facts it has been held that the judiciary may exercise supervisory powers which affect the executive.[12] In Dixon v. District of Columbia, our Court of Appeals stated:

In light of this history I do not believe we are foreclosed from granting immunity from prosecution in order to deter blatant government misconduct. I conclude that in this case our supervisory powers must be used to protect 'the purity of the Government and its processes.' [13]

The history to which the Court of Appeals referred was that of the entrapment cases from the Supreme Court and more recent circuit court cases utilizing supervisory powers over the administration of criminal justice.[14] Similarly, this Court notes that where courts bar confessions or other testimony, particularly when tainted by improper police conduct, they are in effect granting immunity from prosecution based on their supervisory powers. This is not a violation of separation of powers.[15] Although they involve different facts and issues, these cases have a common theme which at once upholds their result, avoids unconstitutional impingement upon the executive branch and directs this court to grant the relief which the defendant here seeks.

■■ That is, when the conduct of an officer of the executive branch becomes enmeshed in the judicial process, the courts have the power and resulting duty to supervise that conduct to the extent its uses the judicial administration of criminal justice. The courts can no more be made the tools of improper administrative conduct than they may "become the 'enforcers' of * * * odious agreements." [16]

Insofar as they are used as instrumentalities in the administration of criminal justice, the federal courts have an obligation to set their face against enforcement of law by lawless means or means that violate rationally vindicated standards of justice, and to refuse to sustain such methods by effectuating them. They do this in the exercise of a recognized jurisdiction to formulate and apply 'proper standards for the enforcement of the federal criminal law in the federal courts' * * *.[17]

12. E.g., *Miranda*, note 9, supra; The Judge-Made Supervisory Power of the Federal Courts, 53 Geo.L.J. 1050 (1965); The Supervisory Power of the Federal Courts, 76 Harv.L.Rev. 1656 (1963). See, Smith v. Katzenbach, 122 U.S.App. D.C. 113, 351 F.2d 810, 815–816 (1965). Accordingly, the issue is not couched in the general terms of the political question doctrine, but rather in the particular standards for the relationship of the U.S. Attorney's Office to the judiciary and the use of the judicial process: See also, Powell v. McCormack, D.C.Cir., 395 F.2d 577, 587 [citing Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)], 589, n. 28, 591–596 (D.C.Cir. 1968). See also, ABA Project, note 9, supra.

13. Dixon v. District of Columbia, 394 F. 2d 966, 970 (D.C.Cir. 1968).

14. Sherman v. United States, 356 U.S. 369, 381, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958); Sorrells v. United States, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932); United States v. McLeod, 385 F.2d 734 (5th Cir. 1967); United States v. Morrison,

348 F.2d 1003 (2d Cir. 1965); Whiting v. United States, 321 F.2d 72 (1st Cir.), cert. denied 375 U.S. 884, 84 S.Ct. 158, 11 L.Ed.2d 114 (1963); Accardi v. United States, 257 F.2d 168 (5th Cir.), cert. denied 358 U.S. 883, 79 S.Ct. 124, 3 L. Ed.2d 112 (1958).

15. Dixon v. District of Columbia, 394 F.2d 966, 970 n. 8 (D.C.Cir. 1968), citing Williamson v. United States, 311 F.2d 441 (5th Cir. 1962). This holding is not contrary to Earl v. United States, 124 U.S. App.D.C. 77, 361 F.2d 531, rehearing denied, 124 U.S.App.D.C. 77, 364 F.2d 666 (1966) (en banc), cert. denied 388 U.S. 921, 87 S.Ct. 2121, 18 L.Ed.2d 1370 (1967), for the court does not hold *it* has the power to grant general immunity directly. Note, 67 Col.L.Rev. 953, 955, 973 (1967). See generally, Powell, supra, n. 12 at 589, 593; ABA Project, note 9, supra.

16. Dixon v. District of Columbia, 394 F.2d 966, 969 (D.C.Cir. 1968).

17. Sherman v. United States, 356 U.S. 369, 380, 78 S.Ct. 819 (concurring opin-

■ Because this power stems from and is directed to the judiciary, it is not an infringement on the nearly unlimited discretion of the U. S. Attorney to determine, for instance, whether as here to enter into agreements with potential defendants, how to charge, whether to seek indictment and in general to prepare his cases for trial.[18] That is the executive function.[19] Even with respect to the conducting of the prosecution, however, our Court of Appeals has in a number of recent cases reversed or commented adversely upon convictions because of the impropriety of the argument of the prosecutor.[20]

■ All that is held here is that if, after having utilized its discretion to strike bargains with potential defendants, the Government seeks to avoid those arrangements by using the courts. its decision so to do will come under scrutiny. If it further appears that the defendant, to his prejudice, performed his part of the agreement while the Government did not, the indictment may be dismissed. In effect what is held here is that when the U. S. Attorney enters into an agreement with the defendant which involves the use of the judicial process, his responsibility transcends the executive function. The doctrine of separation of powers retains its vitality only because it has been flexible enough to classify appropriately such elements of modern political responsibility,[21] as are implied here.

■ Thus, this Court recognizes that within the traditional tripartite division there are overlapping areas of effect as well as competency and where as here this overlap appears, necessarily there are dual responsibilities.[22] Not to act would create a void leaving the defendant helpless, the court responsible.

> Public confidence in the fair and honorable administration of justice, upon which ultimately depends the rule of law, is the transcending value at stake.[23]

ion Frankfurter, J. 1958), citing McNabb v. United States, 318 U.S. 332, 341, 63 S.Ct. 608, 87 L.Ed. 819 (1943).

18. Dixon v. District of Columbia, 394 F. 2d 966, 968 (D.C.Cir. 1968). See, Guilty Plea Bargaining: Compromises by Prosecutors to Secure Guilty Pleas, 112 U. Pa.L.Rev. 865 (1964). But see, ABA Project, note 9, supra.

19. Earl v. United States, 124 U.S.App.D.C. 77, 361 F.2d 531, rehearing denied 124 U.S.App.D.C. 77, 364 F.2d 666 (D.C.Cir. 1966) (en banc), cert. denied 388 U.S. 921, 87 S.Ct. 2121 (1967). But see generally Hobson v. Hansen, 265 F.Supp. 902 (D. D.C.1967): Federal Courts in the District of Columbia are in a peculiar position arguably having article 1 and 11 powers as well as those of Art. 111; The Judge-Made Supervisory Power of the Federal Courts, 53 Geo.L.J. 1050 (1965). "The administration of criminal law in matters not affected by Constitutional limitations * * * is a matter peculiarly of local concern." Fisher v. United States, 328 U.S. 463, 476, 66 S.Ct. 1318, 1325, 90 L.Ed. 1382 (1946); Ricks v. United States, 118 U.S.App.D.C. 216, 334 F.2d 964, 971 (1964). See also, n. 12, supra.

20. Harris v. United States, 402 F.2d 656 (D.C.Cir.) ; Gibson v. United States, 403 F.2d 569 (D.C.Cir.) ; Garris v. United States, 390 F.2d 862 (D.C.Cir. 1968) ; Reichert v. United States, 123 U.S.App. D.C. 294, 359 F.2d 278 (D.C.Cir. 1966). See also, ABA Project, note 9, supra.

21. Cf., Roviaro v. United States, 353 U.S. 53, 61, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957) ; McIlwain, Constitutionalism: Ancient and Modern, 142 (1961).

22. Compare Dixon v. District of Columbia, 394 F.2d 966 (D.C.Cir. 1968), with Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 690, 72 S.Ct. 863, 96 L.Ed. 1153 (Vinson, C.J., dissenting 1952), and see notes 18, 19, supra.

23. Sherman v. United States, 356 U.S. 369, 380, 78 S.Ct. 819 (Frankfurter, J. concurring 1958). State Circuit Court Judge Bowen recently held that in Maryland "the word of the state, once given, cannot be abridged, revoked or diluted * * * [the issue is] the integrity of the state itself and we think that at all costs it must be upheld * * *." Maryland v. Isele, Prince Frederick No. 247 (November 4, 1968). No less can be expected of the Federal Government.

## II.

 Finally, the Government argues that Paiva did not abide by the agreement. It asserts that he "hedged" on his performance by not identifying bonds he had forged, by not supplying handwriting exemplars and by requesting release on special recognizance. The Court finds these assertions either contradicted by the testimony or irrelevant.

Paiva identified over thirty bonds as his. He confessed and was sentenced. The demand for handwriting exemplars was withdrawn at the request of the Secret Service when they advised the U. S. Attorney that they had the desired exemplars from letters to Paiva's wife seized in a raid in June, 1967, on his apartment. Any delay caused by the request for the protective order was justifiable since Paiva had become understandably wary of the Government's investigative conduct. He knew the Government had enough information to close the cases administratively, would only require handwriting for Court prosecutions and had pressured him for information beyond the agreement with the United States Attorney.[24]

The suggestion that Paiva's request for a special release violated the agreement is unconvincing. The request was made in response to investigative pressure that he disclose the location of certain stolen bonds and the name of his supplier. Paiva indicated he did not then know the location and could not guess without informing on others. If temporarily released, he would get them and turn them over to the Government.

 For these reasons the Court finds that there was an agreement and that the defendant performed his part by confessing his guilt, identifying his bonds and describing his participation. By authorizing this prosecution on the "Fien" bonds, apparently due to a misunderstanding between the U. S. Attorney and the Secret Service, the Government has violated its side of the agreement. The Court will not become a participant in this affair.

Accordingly, it is by the Court this 4th day of January, 1969,

Ordered that the indictment in this case be and it is hereby dismissed.

---

24. Testimony indicated that Paiva was incensed by Hofmann and refused to see him, but was willing and did in fact cooperate with other representatives.