**UNITED STATES of America, Plaintiff,**

v.

**Herbert LIEBER, Defendant.**

**UNITED STATES of America, Plaintiff,**

v.

**Jack OPERMAN, Defendant.**

**UNITED STATES of America, Plaintiff,**

v.

**Samuel POPACK and Joseph Popack, Defendants.**

**UNITED STATES of America, Plaintiff,**

v.

**Paul ROTHENBERG, Defendant.**

**Nos. 78 CR 421 through 78 CR 424.**

United States District Court,
E. D. New York.

March 15, 1979.

Edward R. Korman, U.S. Atty., E.D.N.Y., Brooklyn, N.Y., for plaintiff; John B. Curcio, Tax Division, Department of Justice, Washington, D.C., and Diane F. Giacalone, Asst. U.S. Atty., Brooklyn, N.Y., of counsel.

Miller, Cassidy, Larroca & Lewin, Washington, D.C., for defendants; Nathan Lewin, Washington, D.C. and James E. Rocap III, Washington, D.C., of counsel.

## MEMORANDUM OF DECISION AND ORDER

MISHLER, Chief Judge.

The defendants in these proceedings are charged in separate multi-count felony indictments with having violated 26 U.S.C. § 7206(2) by aiding or assisting[1] taxpayers in the preparation and presentation of income tax returns which were false and fraudulent as to material matters. More specifically, it is alleged that the defendants "aid[ed], assist[ed], counsel[ed], procure[d], and advise[d]" taxpayers to claim charitable deductions for contributions to various yeshivas when the contributions had not, in fact, been made.[2] Each of the defendants has moved to dismiss the indictment naming him, claiming that the Government's prosecution of these charges violates a plea agreement entered into on June 23, 1975,[3] pursuant to the terms of which the defend-

---

1. 26 U.S.C. § 7206(2) provides, in pertinent part:

Any person who— . . .
Willfully aids or assists in, or procures, counsels, or advises the preparation or presentation under, or in connection with any matter arising under, the internal revenue laws, of a return, affidavit, claim, or other document, which is fraudulent or is false as to any material matter, whether or not such falsity or fraud is with the knowledge or consent of the person authorized or required to present such return, affidavit, claim, or document . . . shall be guilty of a felony . . . .

2. A different claimed deduction provides the basis for each of the counts. Lieber is charged in ten counts; Operman in seven; Joseph Popack in seven; Samuel Popack in eight; and Rothenberg in four.

3. The defendants have also moved to suppress that evidence obtained during the course of and as a result of the plea negotiations.

ants were to plead guilty to misdemeanor violations under 26 U.S.C. § 7203.[4] An evidentiary hearing was held to resolve the factual issues raised by the motion.

### Background

In the summer of 1974, David Satz, counsel to the Prudential Insurance Co.[5] advised the United States Attorney for the District of New Jersey that an investigation by Prudential indicated that funds from Prudential's Matching Gifts Program had been misappropriated. The Matching Gifts Program offered a contribution from Prudential to certain designated educational and charitable institutions equal to that made by a Prudential employee. Misappropriation of funds occurred when, pursuant to a fraudulent scheme, Prudential was induced to "match" a gift to a designated donee on the false representation of an employee that he had made a charitable contribution. Employees were solicited by individuals such as Lieber, Operman, Rothenberg and the Popacks to participate in the scheme by offering them a commission from the monies obtained from Prudential. The investigation indicated that solicitors advised the employees to take the contribution as a deduction on their personal returns. The contributions thus obtained by the aforementioned solicitors from the Matching Gifts Program were made to various yeshivas in Brooklyn.

In approximately August or September 1974, a Grand Jury investigation was commenced. United States Attorney Jonathan L. Goldstein placed Assistant United States Attorney Edward R. Dauber, Chief of the Consumer Frauds Unit, in charge of the investigation. Dauber believed that the evidence indicated possible mail fraud (18 U.S.C. § 1341) and Internal Revenue Code violations. Grand Jury subpoenas were served on the defendants soon after the Grand Jury convened. Nathan Lewin, Esquire, appeared at the office of the United States Attorney shortly thereafter and advised Dauber and Assistant United States Attorney Robert Romano (assigned to present the case to the Grand Jury) that he represented the defendants. Mr. Lewin had a series of meetings with Dauber and Romano concerning the scope of the investigation; Mr. Goldstein was advised of these discussions and attended some of the meetings. Lewin learned that the United States Attorney was interested in examining the books and records of the yeshivas that had received the contributions. Mr. Lewin urged the United States Attorney's office not to subpoena the records of these institutions, raising a First Amendment argument in which he apparently claimed that such an examination might interfere with the right of Jews to practice their religion or chill the right of congregants to freely associate. Mr. Lewin also urged the United States Attorney not to indict the yeshivas as a matter of prosecutorial discretion. It was then apparently agreed that no subpoenas would issue while Mr. Lewin, on his own, attempted to obtain the information that was being sought. Some time about December 1974 and January 1975, Lewin submitted data to the prosecutors culled from the books of ten or twelve yeshivas, indicating that in no case did the contributions received from the Matching Gifts Program amount to more than five percent (5%) of a yeshiva's budget. At that point, the United States Attorney made no decision as to whether or not he should present evidence against the yeshivas or contributors. However, he decided to seek indictments against the solicitors.

---

4. 26 U.S.C. § 7203 provides, in pertinent part:
   Any person required under this title to pay any estimated tax or tax, or required by this title or by regulations made under authority thereof to make a return (other than a return required under authority of section 6015), keep any records, or supply any information, who willfully fails to pay such estimated tax or tax, make such return, keep such records, or supply such information, at the time or times required by law or regulations shall . . . be guilty of a misdemeanor . . . .

5. Mr. Satz had formerly been the United States Attorney for the District of New Jersey.

During this period of time, Lewin had also been negotiating for the disposition of possible charges against defendants. He first asked that the prosecutors utilize their discretion and decline prosecution. He indicated that the traditional code which forbade orthodox Jews, including the defendants, from giving evidence against fellow Jews (Mesirah), presented a formidable obstacle to a full investigation and might very well present a First Amendment problem.[6] When the prosecutors rejected that suggestion, Lewin suggested a plea to a misdemeanor, possibly based on a tax violation. Some time between January and March 1975, the office of the United States Attorney indicated its interest in the offer and at the same time advised Lewin that approval of such a plea would have to be obtained from the Tax Division of the Department of Justice. Soon thereafter, Lewin called Dauber and advised him that his clients were ready to plead to a violation of 26 U.S.C. § 7207.[7]

In or about April or May 1975, Goldstein called Cono P. Namorato, Chief of the Criminal Section of the Tax Division, Department of Justice, and outlined the facts. He advised Namorato of the difficulty of prosecuting a violation under 18 U.S.C. § 1341 (mail fraud) and the offer of a plea of guilty to 26 U.S.C. § 7207. Namorato advised Goldstein that the Tax Division has "a rather rigid policy" of not using § 7207 and suggested in its stead a plea to 26 U.S.C. § 7203. While there is conflicting testimony regarding the balance of this conversation, the court finds that Goldstein understood that Namorato had authorized the acceptance of a plea to § 7203.[8] Dauber then called Lewin and advised him that Namorato authorized a plea to § 7203.

Dauber and Lewin then discussed the necessity of Lieber, Rothenberg, and Operman executing affidavits in which they would admit their wrongdoing and provide a factual basis for the plea. Dauber also told Lewin that these affidavits were required by the Internal Revenue Service for their

6. The Second Circuit Court of Appeals has held that Mesirah is not a defense to a contempt citation for failure to answer questions before a grand jury. *Smilow v. United States*, 465 F.2d 802, 804 (2d Cir.), *vacated and remanded on other grounds*, 409 U.S. 944, 93 S.Ct. 268, 34 L.Ed.2d 215 (1972).

7. § 7207 provides, in pertinent part:
Any person who willfully delivers or discloses to the Secretary or his delegate any list, return, account, statement, or other document, known by him to be fraudulent or to be false as to any material matter, shall be fined not more than $1,000, or imprisoned not more than 1 year or both. . . .

8. Namorato testified that he did not authorize the § 7203 plea:
I've told [Goldstein] we would not authorize a 7207 disposition. He then said, "Is there any other misdemeanor we could use in this situation?"
I said, "Well, in an appropriate situation we might be able to make out a 7203 violation of Title 26, 7203 failure to file, also makes it a crime to fail to supply information, failure to file timely." . . .

Q. Did you authorize Mr. Goldstein at that time during the telephone call, to employ 7203?
A. No, absolutely not.

(Tr. 324–25). Namorato further testified that he advised Goldstein that he would not authorize such a plea unless he had "the input of the Internal Revenue Service; that I would want to be convinced the facts outlined to me would not establish a tax felony," and that he "would not have ever authorized any U.S. Attorney . . . to take any plea unless I had a package from the Internal Revenue Service setting out the full set of facts and circumstances." *Id.*
Goldstein, on the other hand, testified that after Namorato rejected the idea of using § 7207 as the basis of the plea
he suggested that in 7203 would be an appropriate misdemeanor count, see if you can get Mr. Lewin to agree to that count.
Now, you have to also understand that these conversations between Mr. Namorato and myself do not take place in a vacuum. They take place over a long standing working relationship that he and I have and had at that point probably going back six years, if not longer, plus the fact that I had been in the Department of Justice for maybe almost ten years at that time and very clearly understood how the Department operated and what my authority was and what permission I needed from the Department of Justice.
*There was no question in my mind in that conversation that I was given authority to go back to Mr. Lewin and to negotiate a plea to a 7203 count.* (Tr. 672) (Emphasis added).

files and would be subject to the Service's approval. This was the first time Lewin was advised of the interest of I.R.S. in the plea procedure.[9]

On May 15, 1975, Lewin mailed Dauber drafts of proposed affidavits to be executed by Lieber and Rothenberg. In his covering letter (Defendants' exhibit D), Lewin told Dauber: "The purpose of this submission is to determine whether the form and content of such statements would meet the needs of your office and those of the Internal Revenue Service." Dauber reviewed the affidavits and submitted them to Special Agents Russo and Mulcahy of the I.R.S. On June 11, 1975, Operman's affidavit was mailed to Dauber.

At a June 16, 1975 meeting at which Romano was also present, Dauber went over the draft affidavits with Lewin.[10] Certain changes in the wording of the affidavits were made to conform with the suggestions of Special Agent Russo and the United States Attorney's office. Dauber, by his own testimony, "indicated to Mr. Lewin that the affidavits, the wording that we finally agreed on had been submitted to I.R.S., had been approved."[11] (Tr. 152).

Lewin returned to the United States Attorney's office on June 23, 1975 with Lieber, Operman and Rothenberg. Each defendant entered a conference room and, in the presence of Lewin, Dauber, Romano, and Special Agents Russo and Mulcahy, executed affidavits that generally conformed to the drafts previously reviewed. Russo forwarded the affidavits to I.R.S. Regional Counsel with his report, recommending acceptance of the pleas.

At the meeting, Lewin presented Dauber with a letter that he had prepared earlier in the day, which stated, in pertinent part (Government's exhibit 5):

Pursuant to our discussions over the past months, our clients Herbert Lieber, Jack Operman and Paul Rothenberg, have agreed to plead guilty to one count of violating 26 U.S.C. § 7203 in the District of New Jersey. As a first formal step in carrying out this plea agreement, they will be writing and signing statements today in your office for processing through the Internal Revenue Service. These statements have been shown and discussed with you, and you have indicated that they were, with minor modifications, acceptable to the United States Attorney's Office and to the Internal Revenue Service. It is our understanding that the statements are being written and signed today *exclusively* for the purpose of this plea agreement. If, for any reason, the agreement is not fully executed, the statements will be returned and no use whatever will be made of them by any agency of the federal government.

It is, further, our understanding that the guilty pleas to a violation of 26 U.S.C. § 7203 will conclude all criminal investigations regarding these individuals inso-

---

9. It appears that neither Dauber nor Lewin were certain of the precise reason the I.R.S. required the affidavits. Dauber testified that he was advised by the I.R.S. case agents involved in the case (Russo and Mulcahy) that the I.R.S. needed the affidavits, but that he "[f]rankly [did not] know what the[ ] purpose" of the I.R.S. requirements was. (Tr. 148). Lewin testified that Dauber

said the statements were to be submitted to I.R.S. because of its proper receiving or paper work requirements; that when there was a plea that was going to be taken in a tax case, they had to have that piece of paper in their file. That's what I understood it to be. (Tr. 240).

Apparently the affidavits were to form part of the investigative report that Agent Russo was going to forward to I.R.S. Regional Counsel.

As Namorato indicated in his testimony, *see* note 8 *supra*, as a matter of policy, the Tax Division generally considered Regional Counsel's evaluation of a case when determining whether to accept a plea. *See* note 14 and accompanying text *infra*.

10. Prior to reviewing the affidavits, Samuel Popack, the father of Joseph Popack, met with Dauber and Romano. Apparently, Popack attempted to convince Dauber and Romano that he and his son were innocent of any wrongdoing and that the United States Attorney should decline prosecution against them.

11. Russo testified that while he did make suggested changes in the affidavit, Dauber had not asked him nor did he obtain "official Internal Revenue approval" of the affidavits. (Tr. 535).

far as they relate in any manner to charitable contributions solicited by them under Matching Gift Programs. It is also our understanding that no other inquiry, beyond what is contained in their signed statements, will be made of these individuals in relation to any such investigation or any criminal prosecution.

You have advised me that upon processing of these statements, informations will be filed against our clients and they will be called upon to plead before a United States Magistrate, who will impose sentence.

Although not reflected in the letter, it apparently was also agreed that in order to minimize publicity, the defendants would await the preparation of pre-sentence reports and be sentenced at the time the plea was offered. Dauber read the letter and said, "That's fine." (Tr. 268).

At this point, Lieber, Operman and Rothenberg understood that the plea bargain agreement had been consummated. The United States Attorney understood that he had entered into an agreement to accept a plea to a § 7203 charge in full satisfaction of any possible charges against the three defendants arising out of the Matching Gifts Program.[12] The procedures by which pre-sentence reports are prepared began to be implemented.[13]

Regional Counsel rejected the recommendation of Agent Russo and directed an investigation into the activities of the defendants and others to determine the possibility of bringing felony charges. On September 24, 1975, when Goldstein learned of Regional Counsel's decision, he wrote and asked the Tax Division to overrule Regional Counsel and support him in the agreement (Government's exhibit 8):

After obtaining the plea commitment and your approval, the appropriate material was gathered and submitted to the Regional Counsel by the I.R.S. and was rejected by Regional Counsel. It was resubmitted and has again been refused by the I.R.S. I would appreciate it if you could communicate with the Internal Revenue Service to encourage them to approve the acceptance of the pleas in this matter. Should you be unsuccessful in persuading them, I would appreciate your authorization to proceed to take the guilty pleas . . . .

Although, according to Mr. Namorato, there was no "regulatory or statutory inhibition on the Tax Division . . . authorizing Mr. Goldstein . . . to take the plea" in spite of Regional Counsel's decision (Tr. 345–46), Mr. Namorato, on October 10, 1975 advised Mr. Goldstein that it would not do so. Instead, according to Mr. Namorato's memorandum summarizing their October 10th meeting, it was "mutually decided that I.R.S. would conduct a full-scale investigation into possible *felony* violations of the Internal Revenue Code . . . . In the event that felony prosecution could not be established, the Revenue Service was to inform [the Tax Division], who would in turn contact U.S.A. Goldstein, and ascertain whether or not we would still be able to get misdemeanor pleas to violations of 26 U.S.C. 7203." (Government's exhibit 15).[14]

---

**12.** Goldstein testified that he believed "absolutely" that he was "legally bound" to the terms of the agreement. (Tr. 695–96).

**13.** On July 7, 1975, Dauber forwarded Lewin forms for execution by Lieber, Operman and Rothenberg "to permit the probation department to conduct pre-sentence investigations prior to the entry of a guilty plea." (Government's exhibit 6). Lieber and Rothenberg were interviewed by probation officers on October 8, 1975.

**14.** This decision was somewhat surprising in view of the fact that, according to Namorato, "as a matter of policy, not law," he would be "bound" if Mr. Goldstein had made an "unconditional agreement." (Tr. 357–58). Mr. Goldstein, however, found some explanation for Namorato's determination, stating that it had to be considered in the

context of . . . a deteriorating situation in the relationships between I.R.S. and Tax Division, Washington, D.C.

It was at a time in which both the Tax Division and the I.R.S. and former Commissioner Alexander were vying for position and authority, and it was also a time when we were fighting to try to maintain I.R.S. participation in what I consider public corruption and white collar crime cases and the Commissioner was

Shortly thereafter, Dauber called Lewin and advised him that the United States Attorney was unable to perform its agreement because of the objection of Regional Counsel.

What followed thereafter is somewhat unclear. For present purposes, it suffices to say that the I.R.S. office in Newark became aware of an investigation being conducted by the Intelligence Division of the I.R.S. in Brooklyn, called "Project Rock," involving matching gift programs of a number of institutions including Prudential. Upon learning of this investigation, Goldstein, in the early part of 1976, had the case transferred from his office to the Eastern District of New York. The indictments presently under attack were filed in this district on July 27, 1978.

*Discussion*

The controversy before the court falls within that broad category of cases of which *Santobello v. New York*, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971), is the most prominent, *i. e.*, those in which defendants have sought to hold the Government to promises made during the course of negotiations which preceded the institution of prosecution. Nearly all of these cases, including *Santobello*, have arisen in the context of situations where a defendant had been induced to plead guilty to a given charge by a prosecutor's promise to take or not to take certain action. Others, *see, e.g., United States v. Rodman*, 519 F.2d 1058 1st Cir. 1975), have involved the enforceability of Gov-

ernment promises not to prosecute at all in return for a defendant's cooperation. While this court's research has not revealed a single case on all fours with the instant one, *i. e.*, in which a defendant seeks specific performance of a plea agreement prior to the offer and acceptance of a plea, we believe that the general principles which have developed in these other cases, after being tailored to the facts of the instant case, are applicable here. The Fourth Circuit, in *United States v. Carter*, 454 F.2d 426 (4th Cir. 1972), *cert. denied*, 417 U.S. 933, 94 S.Ct. 2646, 41 L.Ed.2d 237 (1974), provided an accurate statement of the general principle to be applied where a defendant has entered a plea and cooperated with the Government after being promised that he would be exposed to no further charges:

[W]e conclude that if [a] promise was made to defendant [by the government] . . . and defendant relied upon it in incriminating himself and others, the government should be held to abide by its terms. . . . "[I]f, after having utilized its discretion to strike bargains with potential defendants, the Government seeks to avoid those arrangements by using the courts, its decision so to do will come under scrutiny. If it further appears that the defendant, to his prejudice, performed his part of the agreement while the Government did not, the indictment may be dismissed."

454 F.2d at 427–28, *quoting United States v. Paiva*, 294 F.Supp. 742, 747 (D.D.C. 1969).[15]

---

fighting to pull I.R.S. out of these crimes . . .. Namorato [was trying] to find a way to maintain I.R.S. support.

As I read Mr. Namorato's memorandum, I think that he is saying . . . that we were really saying . . . [that] we both know . . . that a felony prosecution is not warranted in this kind of a case . . . .. Tell [I.R.S.] if they want to go out and they want to spend these resrouces, let them go out, let them conduct their investigation knowing, at least in my professional judgment, that when the investigation will be all completed to their satisfaction, their counsel reviewing all the facts would probably have to recommend either the same 7203 plea if it was still forthcoming, or might

even have to recommend a declination . . . . because of the final facts. And so my recollection of the [October 10] conversation was this was really not the time to go back to I.R.S. . . to . . . try to argue with them or convince them to allow the Department to take the plea, although the Tax Division could have on its own . . . accepted a plea right then and there. We decided to let I.R.S. conduct its investigation, and at the conclusion of its investigation, then we will look at the situation once again. (Tr. 677–78).

15. In *United States v. Boulier*, 359 F.Supp. 165 (E.D.N.Y.1972), *aff'd on other grounds sub nom. United States v. Nathan*, 476 F.2d 456 (2d

In *Palermo v. Warden, Green Haven State Prison*, 545 F.2d 286 (2d Cir. 1976), *cert. dismissed*, 431 U.S. 911, 97 S.Ct. 2166, 53 L.Ed.2d 221 (1977), the Second Circuit, for the first time, "examined the extent to which . . . contractual defenses would be applied to plea bargaining in the criminal justice system." *Id.* at 294. It noted that it had previously held "that principles of contract, evolving as they do from the commercial world, are 'inapposite to the ends of criminal justice,' " *id., quoting United States ex rel. Selikoff v. Commissioner of Corrections*, 524 F.2d 650, 654 (2d Cir. 1975), *cert. denied*, 425 U.S. 951, 96 S.Ct. 1725, 48 L.Ed.2d 194 (1976). However, it determined that its "analysis [was to be guided by] the Supreme Court's recognition of plea bargaining as 'an essential component of the administration of justice [which] [p]roperly administered, . . . is to be encouraged,' " and recognized "that the plea bargaining process must be 'attended by safeguards to insure the defendant what is reasonably due in the circumstances.' " *Id.* at 294–95, *quoting Santobello v. New York*, 404 U.S. 257, 260–62, 92 S.Ct. 495, 498–99, 30 L.Ed.2d 427.

■ Thus, the question of whether principles of contract law should be applied to plea agreements turn on public policy considerations. It would be inappropriate for the criminal law to totally embrace principles of contract law. The absence of the availability of specific performance to the Government, for example, is no argument against making it available to the defendants. The purpose to be served, *i. e.*, the encouragement of dispositions through plea agreements, is not lessened if the remedy is not available to the Government. We believe that contract principles need be adopted insofar as their utilization will "insure the defendant what is reasonably due in the circumstances." On the facts of the instant case, we believe that the defendants should be granted specific performance of the agreement.

The Government advances two main arguments in opposition to defendants' motion. First, it contends that no binding agreement was ever consummated. Next, it urges that even if an agreement was reached, dismissal of the indictments is nonetheless unwarranted. We reject both these arguments.

As to the first point, the Government posits that as of June 23, 1975 finalization of the agreement was contingent upon I.R.S. and Tax Division approval and that Lewin was aware of that fact. Thus, it cannot be said that Lieber, Operman and Rothenberg had reason justifiably to believe that the Government had given its word to accept the § 7203 plea. Moreover, even if Dauber and Goldstein did make unqualified promises, giving the defendants the impression that I.R.S. and Tax Division approval had been obtained, it was beyond the scope of their authority to do so; such promises cannot bind the entire Government. Lastly, the Government points to Rule 11 of the Federal Rules of Criminal Procedure which gives the court the power to refuse to accept a plea, and "submits that as a legal matter, a plea agreement cannot be a binding agreement until the guilty pleas have been entered." Government's supplemental response to defendants' motion to dismiss, p. 4.

We find, as a matter of fact, that the Government's first contention—that Lewin knew on June 23, 1975 that the agreement regarding Lieber, Operman and Rothenberg, was contingent on I.R.S. and Tax Division approval—is without merit. As noted in the statement of facts set forth above, upon signing the affidavits, those three defendants believed that the plea agreement—contingent only upon the court's acceptance of the plea—had been finalized.[16] We likewise find that Goldstein and Dauber believed that they had the au-

---

Cir.), *cert. denied*, 414 U.S. 823, 94 S.Ct. 171, 38 L.Ed.2d 56 (1973), this court refused to follow that portion of *Carter* which held that promises of the United States Attorney in one district can, without more, bind a United States Attor-

ney in another district. See pages 892–893 *infra*. We did not, however, disagree with the holding quoted above.

16. *We believe that the fact that Lewin knew that actual entry of the pleas was contingent*

thority, and intended, to enter into a binding agreement. In short, we find that the parties exchanged promises—good consideration in the law of contracts—and entered into the agreement whose terms are outlined above. We also find that the Popacks had not entered into any such agreement.

■ The next question we face is whether Goldstein and Dauber's promise bound the entire Government. We have previously held that a promise of immunity made by a United States Attorney in one district cannot bind a United States Attorney in another district. *United States v. Boulier*, 359 F.Supp. 165 (E.D.N.Y.1972), *aff'd on other grounds sub nom. United States v. Nathan*, 476 F.2d 456 (2d Cir.), *cert. denied*, 414 U.S. 823, 94 S.Ct. 171, 38 L.Ed.2d 56 (1973). We adhere to this principle as a general matter, but believe it should not properly be applied to the facts before us. The principal negotiators for the Government had contacted representatives of the Tax Division (Namorato), and I.R.S. (Russo). They believed, in good faith, that they had the authority to enter into the agreement. By reason of Goldstein's and Dauber's representations, defendants, through Lewin, understood that all necessary authorization had been obtained. Thus *Boulier* is inapposite. There, the defendant knew or should have known that the authority of the United States Attorney is limited to matters arising within the district to which he is assigned. 28 U.S.C. § 545. Here, the defendants recognized the limited extent of the United States Attorney's authority, but were led to believe that he had the authority to enter into the agreement.

We should also note in this regard, that in the realm of contract law, the principle of inherent authority is not unheard of.

While the analogies that we can draw to the instant case are, necessarily, rather rough, we point to that concept merely to show that unauthorized acts of agents may, in some instances, bind principals. Thus, section 161 of the Second Restatement of the Law of Agency provides:

> A general agent for a disclosed or partially disclosed principal subjects his principal to liability for acts done on his account which usually accompany or are incidental to transactions which the agent is authorized to conduct if, although they are forbidden by the principal, the other party reasonably believes that the agent is authorized to do them and has no notice that his is not so authorized.

We believe that the defendants, having been reasonably lead to believe, by individuals who had all the indicia of authority to enter into an agreement, that those individuals in fact had such authority, may hold the "principal," *i. e.*, the Government, to the agreement. We should demand a standard of fair dealing by our Government that is no lower than that required in the commercial world.[17]

We should also point out that the question whether unauthorized promises made by prosecutors can be enforced was raised and answered in *Palermo v. Warden, supra*. There, a state prosecutor had promised a defendant that if he plead guilty to certain charges and cooperated with the authorities, he would be placed on parole after one year. Having not received parole, he sought federal habeas relief. The State, pointing to the fact that prosecutors have no authority to grant parole, "[a]cknowledge[d] the general proposition that prosecutors must keep promises, [but] nevertheless contend[ed] that it can dissociate itself

---

upon the court's action provided the basis for his precautionary remarks, such as those which appear in his letter of June 23, 1975, *see* pps. 888–889 *supra*, that "If, for any reason, the agreement is not fully executed, the statements [affidavits] will be returned and no use whatever will be made of them by any agency of the federal government." We do not think, contrary to the Government's position, that these statements evidence knowledge that further Government approval was required.

17. Indeed, the testimony of Namorato, *see* note 14 *supra*, was that "as a matter of policy" the Tax Division abided by unauthorized plea agreements reached by United States Attorneys. While we do not rest our holding on that point, we do not see any compelling reason why the defendants should not receive the benefit of that policy.

from a promise if the prosecutor lacked the authority to make the commitment in question." 545 F.2d at 295. The Second Circuit expressly "disagree[d]," *id.*, with that position:

> Clearly . . . *Santobello* requires relief when the prosecutor fails to fulfill promises within his power made in negotiating a plea bargain. *United States v. Brown*, 500 F.2d 375 (4th Cir. 1974); *United States v. Ewing*, 480 F.2d 1141 (5th Cir. 1973). *We believe that the reasoning underlying* Santobello *applies no less when the prosecutor makes unfulfillable promises in negotiating a plea.*

*Id.* at 296 (emphasis added).

The last salvo of the Government's attack on the existence of a binding agreement, *viz.*, that, as a matter of law, a plea agreement cannot be binding until the plea is accepted by the court, must similarly be rejected. There might be some circumstances where acceptance of a plea would be a necessary precondition to the Government's obligation becoming operative. For example, the Government may promise to make a recommendation as to sentence once a plea is accepted. If the plea is not accepted, the Government would, in all probability, be relieved of its obligation. However, in the instant case, the terms of the agreement reached and its performance did not hinge on any court action. In essence, the Government merely promised to give the defendants the opportunity to plead guilty in return for their promise to admit guilt and offer the plea. Enforcement of agreements which do not involve court participation are not unknown. Thus, in *United States v. Rodman, supra*, the First Circuit affirmed the dismissal of an indictment which had been issued following the SEC's failure to keep its promise to recommend that no criminal action be taken against a defendant whose cooperation had been induced by that promise. The language used by the Eighth Circuit in *United States v. Minnesota Mining and Mfg. Co.*, 551 F.2d 1106 (8th Cir. 1977) is also instructive. There, a corporation and one of its officers agreed that they would plead guilty to a charge and cooperate fully with the Government. In return, the Government agreed that it would not bring any further charges against the corporation or any of its other officers. After the original plea was entered—without the Court's knowledge of the agreement—and the corporation fulfilled its obligation to cooperate, the Government brought additional charges against the corporation and two officers who had not been involved in the original plea. The Eighth Circuit affirmed the district court's dismissal of the indictment:

> This was not a traditional plea bargain arrangement in which the trial judge was a participant. Rather, it was a prosecutorial agreement, the inviolability of which rested completely in the province of the government prosecutors, who have the sole power and responsibility to institute criminal proceedings. . . . The Government breached this promise by returning the present indictment against defendants. The remedy for the breach of this promise rests in the discretion of the trial court, *see Santobello v. New York*, 404 U.S. 257, 263, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971), and under the circumstances of this case we cannot say that the remedy of dismissing the indictment was either undue or an abuse of discretion.

551 F.2d at 1112. *See also United States v. Phillips Petroleum Co.*, 435 F.Supp. 622, 640 (N.D.Okl.1977). The Government here tries to distinguish these cases and others, *see, e. g., United States v. Carter, supra*, by pointing to the fact that, in those cases, the defendants had agreed to cooperate with the prosecution by giving testimony, etc. "In the instant case . . . no cooperation was bargained for. To the contrary, defendants specifically refused to testify before the grand jury, citing religious scruples. The only term accruing to the benefit of the government was the defendants' entry of guilty pleas." Government's response to joint motion to dismiss for violation of a prior plea bargain, p. 11. We do not believe that this distinction in the nature of defendants' obligations under the agreement is crucial. They began to per-

form and have been willing to complete the performance of all their obligations. That the Government struck a bad bargain should not weigh against the defendants. While the terms may not have been as advantageous to the Government as those obtained in other cases, as in other cases, an agreement was nonetheless reached.

We thus reach the question of whether the instant indictments should be dismissed. The Government argues that such relief is inappropriate because (i) the defendants have not been prejudiced by the breach, i. e., they are in no worse a position than they were before consummation of the agreement, and (ii) dismissal of the indictments by the court would constitute an unwarranted incursion into the authority of the executive branch to determine when and how to prosecute violators of the law. While these arguments raise troublesome and close questions, we believe that against the backdrop of the policy considerations outlined above they must be rejected.

In primary support for its position that the defendants must show "prejudice" in order to obtain relief, the Government points to the language in *United States v. Paiva*, 294 F.Supp. 742 (D.D.C.1969) which was quoted in *United States v. Carter, supra*, and which we have referred to earlier, *see* page 890 *supra*: "If it . . . appears that the defendant, *to his prejudice*, performed his part of the agreement while the Government did not, the indictment may be dismissed." 294 F.Supp. at 747 (emphasis added).

Defendants urge that they have relied to their prejudice on the Government's promise since they opened themselves up to scrutiny by those preparing presentence reports and "reordered their lives in 1975 to adjust to their anticipated public entry of guilty pleas." Memorandum of Points and Authorities in Support of Joint Motion to Dismiss for Violation of a Prior Plea Bargain, p. 18. We are uncertain that this is the type of "prejudice" which the *Paiva* court was referring to. However, on the facts before the court, the "prejudice" suffered by the defendants is no less than that suf-

fered by the defendant in *Paiva*. There, the defendant had agreed to plead guilty to several charges and cooperate with the Government in resolving other cases, in return for a promise that he would not be prosecuted on charges arising out of those other cases. A term of the agreement was that defendant's "cooperation would not include informing on others who might have been involved with him." 294 F.Supp. at 743. He carried out his obligations, but the Government, dissatisfied with the fact that defendant refused to provide information regarding others, indicted him on an additional charge. The court found that dismissal of the indictment was appropriate since "there was an agreement and . . . the defendant performed his part by confessing his guilt . . . and describing his participation," while "the Government . . . violated its side of the agreement." 294 F.Supp. at 748. Here, as in *Paiva*, the defendants confessed their guilt and described their participation in the scheme. There, as here, defendants did not inform on others. Again, if the defendants did not give the Government any more, it was because the Government negotiators struck a bad bargain. Yet, it was a bargain nonetheless.

We should also note that we are uncertain whether, in any event, a showing of "prejudice" is required in a case such as this. In *Santobello* itself, the breach of the bargain complained of was that following the court's acceptance of a plea, the prosecutor, contrary to a promise not to make a recommendation as to sentence, had recommended that the defendant be given the maximum sentence. The sentencing judge stated, on the record, that the recommendation did "not at all influence [ ]" him in his sentencing decision. *See* 404 U.S. at 259, 92 S.Ct. at 497. The Supreme Court nonetheless "conclude[d] that the interests of justice and appropriate recognition of the duties of the prosecution in relation to promises made in the negotiation of pleas of guilty will best be served," by affording the defendant appropriate relief. *Id.* at 262, 92 S.Ct. at 499. Thus, even in the absence of actual prejudice, the Court found that the

Government should not be allowed simply to renege on its promises. It may be argued that the actual offer and acceptance of the plea in *Santobello* and other cases of that nature constituted prejudice to the defendant. However, by their very nature, cases such as *Santobello* involve accepted pleas. As *Rodman* teaches, acceptance of a plea is not the *sine qua non* of enforcing Government promises. By living up to their bargains, the defendants here suffered to their detriment in exactly the manner required by the agreement. They are entitled to a remedy.

The remedy of dismissing the indictments, the Government argues, is not justified by these facts. As the Sixth Circuit has stated in *United States v. Leininger*, 494 F.2d 340, 341 (6th Cir. 1974): "The right of a court to dismiss a criminal indictment on its own motion is limited to extreme circumstances . . . . Ordinarily, the decision to prosecute . . . rests with the prosecuting arm of government." Our own Circuit Court has only recently echoed this principle:

> [W]hile a district court may grant a new trial after conviction, pursuant to Fed.R. Crim.P. 33, "in the interest of justice," it does not have the power to *dismiss* an indictment that is legally sufficient under the test of Rule 29, simply because it deems the dismissal to be in the interests of justice.

*United States v. Tanu*, 589 F.2d 82 at 86 (2d Cir. 1978) (emphasis in original), *citing United States v. Weinstein*, 452 F.2d 704 (2d Cir. 1971), *cert. denied*, 406 U.S. 917, 92 S.Ct. 1766, 32 L.Ed.2d 116 (1972). In the same case, the court continued:

> Under the separation of powers, the executive branch, rather than the judiciary, retains the power to dismiss prosecutions on other than strict grounds of insufficiency in law. . . . "The Executive remains the absolute judge of whether a prosecution should be initiated

and the first and presumptively the best judge of whether a pending prosecution should be terminated."

589 F.2d at 86–87, *quoting United States v. Cowan*, 524 F.2d 504, 513 (5th Cir. 1975), *cert. denied*, 425 U.S. 971, 96 S.Ct. 2168, 48 L.Ed.2d 795 (1976). *See also United States v. Broward*, 594 F.2d 345 (2d Cir. 1979); *United States v. Fields*, 592 F.2d 638 (2d Cir. 1978).

We do not question the correctness of these statements. However, we feel that they are inapplicable to the issues before us. We are not being asked to dismiss the indictments "on our own motion," "in the interests of justice" because of any prosecutorial misconduct. *See United States v. Broward, supra; United States v. Fields, supra.* Rather, we are being asked to order performance of an agreement by which the Government bound itself not to prosecute the charges in the indictment on the happening of certain events, *i. e.,* the defendants' offer and the court's acceptance of the plea. Ordering specific performance of the agreement does not constitute an interference with the functioning of the executive branch, any more than would ordering specific performance of a Government procurement contract. That is, it certainly is the executive branch's duty to purchase goods, let us say, for the military. It would be difficult to imagine a situation in which the court could justify, in a vacuum, an order that the executive branch purchase those goods. Yet, it is just as certain that if the executive did enter into such a contract and then breached it, the court could order its performance.

The power of the court to order specific performance of agreements such as these was recognized by the Supreme Court in *Santobello. See* 404 U.S. at 263, 92 S.Ct. at 499. Recently, the Second Circuit, in *United States v. Fields*, 592 F.2d 638 (2d Cir. 1978), although reversing the district court's dismissal of portions of an indictment,[18] cited with approval *United States v. Minneso-*

---

18. In *Fields* the issue before the Second Circuit was "whether the district court in [a] *criminal* action abused its discretion in dismissing and striking substantial portions of [an] indictment

because of alleged misconduct by employees of the SEC in attempting to settle the *civil* action." at 646–647 (emphasis in original). The Circuit Court found that the district court had

*ta Mining & Mfg. Co.*, 551 F.2d 1106, 1112 (8th Cir. 1977), discussed at p. 893 *supra*, where a "dismissal of [an] indictment [was] affirmed because of breach of [a] '*prosecutorial* agreement, the inviolability of which rested completely in the province of the government *prosecutors*.'" At 647, n. 22 (emphasis in original).

█ Thus we hold that it is well within our province to order that the defendants Lieber, Operman and Rothenberg be given an opportunity to plead, as agreed, to a violation of 26 U.S.C. § 7203. If the court accepts the pleas, then the present indictments will be dismissed.[19]

### Conclusion

Defendants Lieber, Operman and Rothenberg are entitled to specific performance of the agreement they entered into with the Government on June 23, 1975. Defendants Samuel Popack and Joseph Popack did not enter into a plea agreement with the Government.

It is hereby

ORDERED that the United States Attorney for the Eastern District of New York draw an information charging defendants with a violation of 26 U.S.C. § 7203 based on the affidavits submitted by Lieber, Operman and Rothenberg, and it is further

ORDERED that in the event the Government fails to file an information on or before April 1, 1979, the indictment shall be dismissed as against defendants Lieber, Operman and Rothenberg, and it is further

ORDERED that defendants be arraigned before the undersigned on the charge in the information and it is further

ORDERED that in the event the defendants offer a plea of guilty to the charge and the court accepts said pleas, the above-numbered indictments shall be dismissed against defendants Lieber, Operman and Rothenberg at the time of sentencing, and it is further

ORDERED that the motions of defendants Lieber, Operman, Rothenberg, Samuel Popack and Joseph Popack, to suppress evidence are in all respects denied, and it is further

ORDERED that the motions of defendants Samuel Popack and Joseph Popack to dismiss the indictment are in all respects denied.

---

abused its discretion. *Id.* However, the court also held that dismissal is appropriate where it is necessary "to achieve one or both of two objectives: first, to eliminate prejudice to a defendant in a criminal prosecution; second, to 'help to translate the assurances of the United States Attorneys into consistent performances by their assistants.'" at 647, *quoting United States v. Estepa*, 471 F.2d 1132, 1137 (2d Cir. 1972) (Friendly, J.). Outright dismissal of the indictments here would, we believe, be justified in light of this language. However, we emphasize that we are merely ordering that the Government do what it committed itself to do.

**19.** The defendants' motion to suppress evidence obtained as a result of the plea negotiations, *see* note 3 *supra*, is denied. The court finds that all the evidence in the Government's hands was gathered by the Government independently. The Government had evidence of the defendants' participation in the crimes charged when it received the file from Prudential. Information given by the defendants added nothing to the store of the Government's data. Of course, this holding is not to be considered as a bar to subsequent application of Rule 410 of the Federal Rules of Evidence.